**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GREGORY DICKENS,
*Petitioner-Appellant*,

v.

CHARLES RYAN,
*Respondent-Appellee*.

No. 08-99017

D.C. No.
CV-01-757-
PHX-NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted En Banc
June 24, 2013—Seattle, Washington

Filed January 23, 2014

Before: Alex Kozinski, Chief Judge, and Harry Pregerson,
Kim McLane Wardlaw, Marsha S. Berzon, Jay S. Bybee,
Consuelo M. Callahan, Sandra S. Ikuta, N. Randy Smith,
Mary H. Murguia, Morgan Christen and Paul J. Watford,
Circuit Judges.

N.R. Smith, Circuit Judge, delivered the opinion of the
Court, which is joined in full by Judges Ikuta and Watford.
Chief Judge Kozinski, Judge Bybee, and Judge Callahan
join Parts I and II. Judges Pregerson, Wardlaw, Berzon,
Murguia, and Christen join Part III.

Opinion by Judge N.R. Smith;
Partial Concurrence by Chief Judge Kozinski;
Concurrence by Judge Watford;
Partial Concurrence and Partial Dissent by Judge Callahan;
Partial Concurrence and Partial Dissent by Judge Christen

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The en banc court affirmed in part and vacated in part the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for felony murder and conspiracy to commit armed robbery.

In Parts I and II of the opinion, the en banc court held that, applying *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), the Arizona Supreme Court did not unreasonably conclude that petitioner Dickens was eligible for the death sentence because he was a major participant in the victims' robbery/murder and acted with reckless indifference to human life. The majority also agreed that the state court's decision was not based on an unreasonable determination of fact.

In Part III of the opinion, the en banc court held that Dickens's claim of ineffective assistance of counsel was procedurally defaulted and should be remanded to allow the district court to evaluate whether Dickens can show cause and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

prejudice under the Supreme Court's intervening decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). The majority also provided guidance to the district court by explaining that: (1) *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), does not bar the federal district court from considering the procedurally barred ineffective assistance claim because it was not previously adjudicated on the merits by the state courts; (2) Dickens's other, previously adjudicated ineffective assistance claims did not foreclose the procedurally barred claim; and (3) 28 U.S.C. § 2254(e)(2) does not bar an evidentiary hearing on remand for Dickens to show cause and prejudice to overcome the procedural bar.

Chief Judge Kozinski, joined by Judges Bybee and Callahan, concurred in Parts I and II. He wrote separately because he believes the Arizona Supreme Court's application of *Enmund* and *Tison* was not just reasonable, but entirely correct.

Judge Watford concurred, except to the extent that the majority suggested that the state court correctly applied *Tison* and *Enmund* to the facts of Dickens's case. He agreed that the state court's application of those precedents was not unreasonable, but under an independent evaluation of those cases he would have held that the Eighth Amendment bars Dickens's execution.

Judge Callahan, joined by Chief Judge Kozinski and Judge Bybee, concurred in Parts I and II of the majority opinion and dissented from Part III. She explained that there are three strikes against Dickens and he should be out of court: (1) Dickens is not eligible for the narrow exception to the exhaustion requirement under *Martinez* because the state court rejected his claim on the merits; (2) Dickens's specific

allegations of organic brain damage and Fetal Alcohol Syndrome do not amount to a new claim of ineffective assistance regarding mitigating evidence; and (3) a review of counsel's performance on the merits would result in the conclusion that counsel adequately presented mitigating evidence and any failings were not prejudicial.

Judge Christen, joined by Judges Pregerson, Wardlaw, Berzon and Murguia, dissented from Parts I and II of the majority opinion and concurred in Part III. She dissented because imposing the death penalty in this case is an unreasonable application of clearly established law as articulated in *Enmund* and *Tison*, and at least two unreasonable findings of fact were critical to the state court's decision. She would grant relief and decline to reach Dickens's *Martinez* argument. Because the majority did reach the *Martinez* issue, Judge Christen joined in the judgment to vacate the district court's ruling and remand for consideration of the issue in light of *Martinez*.

---

## COUNSEL

Robin C. Konrad (briefed and argued) and Dale A. Baich, Assistant Federal Public Defenders, Federal Public Defender's Office, Phoenix, Arizona, for Petitioner-Appellant.

John P. Todd, Assistant Attorney General, Capital Litigation Section, Arizona Attorney General's Office, Phoenix, Arizona, for Respondent-Appellee.

---

**OPINION**

N.R. SMITH, Circuit Judge:

Arizona state prisoner Gregory Scott Dickens appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. We affirm the district court's conclusion that (1) the Arizona Supreme Court did not unreasonably apply *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), to the facts of this case and (2) the Arizona Supreme Court did not base its decision on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). However, we reverse the district court's denial of one of Dickens's ineffective assistance of counsel claims.[1] While we agree that Dickens defaulted on this claim by failing to fairly present the claim to the Arizona courts, we remand to allow the district court to reassess whether Dickens can establish cause and prejudice to excuse the procedural default under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

**FACTS[2]**

In January 1990, Dickens became acquainted with then fourteen-year-old Travis Amaral. Dickens met Amaral while working as a counselor at Oak Grove Institute in Temecula, California. Oak Grove is a placement center for violent

---

[1] Dickens raises other uncertified issues on appeal, which we address in a separate Memorandum Disposition filed concurrently with this Opinion.

[2] These facts are drawn substantially from the Arizona Supreme Court's opinion in *State v. Dickens*, 926 P.2d 468, 474–75 (Ariz. 1996) (in banc). We presume the correctness of the Arizona court's findings unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

juveniles where Amaral lived at the time. While working with Amaral, Dickens learned that he was a "high risk" patient with a "violent and explosive temper." Dickens also discovered that Amaral battered a nurse and frequently bragged about carrying guns and being involved in several murders. In March 1990, Dickens quit working at Oak Grove, but continued his friendship with Amaral.

In early September 1991, Dickens moved to Yuma, Arizona. A few days after his move, Amaral contacted Dickens and explained that he was running away from home. Dickens purchased a bus ticket for Amaral to travel to Yuma. Amaral arrived in Yuma on September 8, 1991. The two then spent the next several days recreating near the Colorado River. Dickens showed Amaral a .38-caliber revolver he had recently acquired and, at some point during their time together, Amaral attempted to intimidate Dickens by pointing the revolver at Dickens's head.

Dickens paid for Amaral's food and transportation during his visit to Yuma. But Dickens was running low on cash. On September 10, 1991, Dickens and Amaral discussed "ways to get more money," while eating dinner at a Hardee's restaurant. Dickens suggested they plan a robbery. They flipped a coin to decide who would conduct the first robbery. Amaral won. Dickens then gave Amaral a choice of several locations to commit the robbery. His options included a convenience store and a highway rest stop. Amaral selected the rest stop since it was "out of the way," less busy, and "easier."

Dickens and Amaral left the restaurant and drove to a rest area on the eastbound side of Interstate 8, east of Yuma. Dickens removed his .38-caliber revolver from the glove

compartment and placed it on a seat in the vehicle. At some point while waiting at the rest stop, Amaral again pointed the revolver at Dickens's head to intimidate him. After waiting at the rest area for approximately three hours, Dickens and Amaral saw Bryan and Laura Bernstein enter the rest area for westbound traffic on the opposite side of the freeway.[3] Dickens nodded his head and either handed Amaral the handgun or watched him remove it from the seat. They agreed that, once Amaral robbed the Bernsteins, he would run down the westbound ramp of the rest area where Dickens would pick him up.

Dickens watched from his truck on the opposite side of the highway as Amaral crossed the interstate, approached the

---

[3] Bryan and Laura were both 22 years old. They had been married for three years and graduated from Cornell University. When they were murdered, they were traveling through Arizona en route to UCLA where they both received fellowships to undertake graduate work.

The jury heard evidence that the Bernsteins were not the first car to enter the rest area during the three hours that Dickens and Amaral waited for victims. Amaral testified that between four and six other cars entered and exited the rest area before the Bernsteins arrived. At some point, a car full of six people entered. Dickens asked Amaral whether Amaral thought he could "pull off" the robbery of those people or whether Amaral wanted to wait for "something easier." Amaral responded that they should wait, because six people were "too many for the amount of bullets [they] had." While we mention this testimony, we omit it from our statement of facts, and do not rely on it in our *Enmund/Tison* analysis below, because the Arizona Supreme Court did not rely on this testimony in its discussion of the evidence supporting the *Enmund/Tison* findings. *See Dickens*, 926 P.2d at 490–91.

Bernsteins, and asked if they had the time.[4] Laura responded, "9:17 [p.m.]." Amaral then pointed the gun at Bryan and demanded his wallet. Once Bryan surrendered his wallet, Amaral asked Laura for her wallet, but she did not have one. Amaral then ordered the Bernsteins to walk past their car and turn around. From the opposite side of the highway, Dickens observed Amaral moving the Bernsteins across the beams of light from their headlamps. Amaral asked if they were ready to die and then shot Laura in the head. Dickens saw the bright flash of the gun as Amaral shot Laura. Laura fell to the ground and Bryan crouched down over her. Amaral then recocked the revolver, pointed it at Bryan, and shot him in the head.

After observing the robbery and shootings, Dickens drove across the median and through the rest area. No evidence

---

[4] The Arizona Supreme Court noted that "Amaral also testified that he carried a two-way walkie-talkie that [Dickens] had given him, and [Dickens] had one with him in his truck." 926 P.2d at 474. And that "Speaking through the walkie-talkie, [Dickens] then told Amaral, 'No witnesses.' Amaral asked, 'What?' [Dickens] replied, 'You know what I mean, no witnesses.' Amaral responded, 'What do you mean by no witness? If I kill them, there are no witnesses; If I leave them here, there are witnesses.' [Dickens] replied, 'No witnesses.'" *Id*. The district court also relied on this factual summary. However, Dickens presented evidence at trial showing that Amaral's statements were inconsistent and that his testimony was contradicted by his fellow prisoners. Ultimately, the Assistant Attorney General conceded before the Arizona Supreme Court that "the one part the jurors and trial court didn't believe, was the talk about the walkie-talkie" and that the Arizona Supreme Court "shouldn't believe, the walkie-talkie testimony." Thus, we omit from our factual summary any reference to the alleged walkie-talkie conversation. However, the jury's disbelief of the walkie-talkie testimony does not show that the Arizona Supreme Court's decision was unreasonable, because the court did not rely on this testimony in its discussion of the evidence supporting the *Enmund/Tison* findings. *See Dickens*, 926 P.2d at 490–91.

suggests Dickens stopped to aid the Bernsteins, called for emergency medical assistance, or otherwise notified the authorities. Dickens then picked up Amaral on the westbound side of the highway and asked, "Do you have the wallet?" Amaral replied that he did and handed the wallet to Dickens. Dickens searched the wallet and returned it to Amaral. Dickens explained to Amaral that he had driven through the rest area to make sure "everything was taken care of." They then drove to the home of Dickens's brother where Amaral removed cash, traveler's checks, and one credit card from Bryan's wallet. Dickens and Amaral burned the wallet and its remaining contents. They split the cash, Amaral pocketed the credit card and they later destroyed the traveler's checks.

At approximately 9:40 p.m., a deputy sheriff drove into the rest area and found the Bernsteins lying on the ground in front of their vehicle. Laura was dead. Bryan was semiconscious, thrashing around, and moaning in pain. Bryan told the deputy that he had been threatened with a gun, attacked, and thought he had been shot. Bryan died shortly thereafter.

On September 11, the morning following the murders, Amaral unsuccessfully attempted to use Bryan's credit card at a local K-Mart. Dickens and Amaral spent that night at a Motel 6 where Dickens had rented a room. Early the next morning, Dickens drove to Carlsbad, California, and Amaral went back to his mother's house.

Dickens and Amaral met up again in March 1992, and Amaral stayed with Dickens for one or two weeks in a San Diego, California apartment. Amaral's mother reported Amaral as a runaway and gave Dickens's address to the

police. The police conducted an investigation into sex abuse charges against Dickens. San Diego police officers eventually arrested Dickens on charges of sexually abusing Amaral (and other boys) and assault with a deadly weapon.[5] During an interview concerning the alleged abuse, Amaral told officers that he and Dickens had been involved in the double homicide in Yuma.

## PROCEDURAL HISTORY

In April 1992, Dickens was indicted for two counts of premeditated first-degree murder, two counts of felony first-degree murder, one count of conspiracy to commit first-degree murder, one count of conspiracy to commit armed robbery, and two counts of armed robbery. After a trial, he was acquitted of premeditated murder and conspiracy to commit murder. However, he was convicted of the felony murders and armed robberies of Bryan and Laura Bernstein and conspiracy to commit armed robbery. The sentencing court found no mitigating factors and thus sentenced Dickens to death on the felony murder counts.[6] The sentencing judge ordered that, if the sentences were ever reduced, then they should be served consecutively. The court also sentenced Dickens to fourteen years' imprisonment on the conspiracy and armed robbery convictions, to be served consecutively to the death sentences.

---

[5] This information was not provided to the jury.

[6] The district court sentenced Dickens to death prior to the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), that juries (rather than courts) must determine the presence or absence of aggravating factors meriting imposition of the death penalty. The procedural rule announced in *Ring* "does not apply retroactively to cases already final on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

Dickens applied for post-conviction relief from the trial court but was denied. Dickens then appealed his conviction and sentence to the Arizona Supreme Court. That court affirmed the trial court's denial, noting that "[t]his is not a case of lingering doubt" and that overwhelming evidence supported the conviction and capital sentences. *State v. Dickens*, 926 P.2d 468, 493 (Ariz. 1996) (in banc).

Dickens subsequently filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 with the U.S. District Court for the District of Arizona. In the federal habeas proceeding, Dickens changed his ineffective assistance of counsel ("IAC") claim to include extensive factual allegations that he suffered from Fetal Alcohol Syndrome ("FAS") and organic brain damage. The district court concluded that Dickens's new claim was procedurally barred and, with regard to his other arguments, denied his petition. Dickens appealed the district court's decision to this court.

A divided panel of our court affirmed the district court's denial of Dickens's *Enmund/Tison* claim. However, all three judges agreed that the district court's conclusion that Dickens procedurally defaulted his IAC claim should be vacated and remanded to allow the district court to reassess the claim in light of the Supreme Court's decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Both parties petitioned for this Court to rehear the case en banc, and a majority of non-recused active judges voted to rehear the case.

## STANDARD OF REVIEW

We review de novo the district court's order denying the petition. *Estrada v. Scribner*, 512 F.3d 1227, 1235 (9th Cir. 2008).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to this court's review of Dickens's claims. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The threshold a defendant must overcome to obtain relief under AEDPA is high. Specifically, to obtain relief under AEDPA Dickens must show that the Arizona Supreme Court's decision was either  (1) "contrary to" clearly established federal law as determined by the Supreme Court, (2) "involved an unreasonable application of such law," or (3) "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 785 (2011) (quoting 28 U.S.C. § 2254) (internal quotation marks omitted).

Because the relevant state court determination for a habeas petition is the last reasoned state court decision, we review the Arizona Supreme Court's decision denying Dickens relief. *See Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 804–06 (1991)). "State-court decisions are measured against [the Supreme Court's] precedents as of 'the time the state court renders its decision.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75–76 (internal quotation marks and citation omitted). "Rather, that application must be *objectively unreasonable*." *Id*. at 76 (emphasis added).

**DISCUSSION**

Dickens argues that the Arizona Supreme Court unreasonably applied *Enmund/Tison* when it upheld Dickens's death sentence.[7] Dickens also argues that the Arizona Supreme Court based its decision on an unreasonable determination of the facts. Finally, Dickens claims that his counsel was ineffective at sentencing, because counsel failed to adequately investigate and present certain mitigating evidence.

We reject Dickens's first two arguments and affirm the district court's denial of Dickens's *Enmund/Tison* claim. However, we reverse the district court's conclusion that Dickens failed to show cause to overcome his procedural default and remand so that the district court can determine whether Dickens can show cause and prejudice under *Martinez*.

---

[7] "A decision can be 'contrary to' federal law in one of two ways: if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases,' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [that] precedent.'" *Brown v. Horell*, 644 F.3d 969, 978 (9th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). In contrast, "a decision is an 'unreasonable application' of clearly established federal law" in cases where the state court identified "the correct legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Cunningham v. Wong*, 704 F.3d 1143, 1153 (9th Cir. 2013) (internal quotation marks omitted). Here, the Arizona Supreme Court recognized *Enmund* and *Tison* as the relevant precedent, so only the "unreasonable application" prong of § 2254(d)(1) is at issue.

## I.   The Arizona Supreme Court did not unreasonably apply *Enmund/Tison*.

The Arizona Supreme Court correctly identified *Enmund* and *Tison* as the clearly established federal law governing Dickens's claim.  In *Enmund*, the Supreme Court reversed the death sentence of a defendant convicted under Florida's felony-murder rule.  458 U.S. at 798.  In *Tison*, the Supreme Court affirmed the death sentences of two defendants convicted under Arizona's felony-murder rule.   481 U.S. 137.**[8]**   In distinguishing between the two cases, the *Tison* Court articulated a two prong standard to determine whether a felony murder defendant is death eligible.  For a death sentence to be constitutional under the Eighth Amendment, the state must show the defendant's "[1] major participation in the felony committed, [2] combined with reckless indifference to human life."  481 U.S. at 158.  For the reasons stated below, the Arizona Supreme Court did not unreasonably conclude that Dickens was a major participant in the Bernsteins' robbery/murder and acted with reckless indifference to human life.

### A.  Major participation

Dickens claims that his participation in the crimes was insufficient to warrant a death sentence, like the defendant in *Enmund*.  Enmund was the driver of the getaway car in an armed robbery in which his accomplices murdered an elderly couple who resisted the robbery.  458 U.S. at 784–86.  The Court determined that Enmund "did not commit the

---

**[8]** The Court remanded for further proceedings to determine whether the defendants acted with reckless disregard for human life.  *Tison*, 481 U.S. at 158.

homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder." *Id*. at 795. The Court noted that "the only evidence of the degree of [Enmund's] participation [was] the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes[,] . . . waiting to help the robbers escape . . . ." *Id.* at 786 (internal quotation marks omitted). There was no evidence that Enmund provided the murder weapons, knew of the shooters' violent propensities, planned the underlying crime, or continued to assist the perpetrators after they murdered their victims. Enmund's *only* participation was that of getaway driver. *Id.* at 786 n.2.

By contrast in *Tison*, the defendants helped their father and his cellmate—both convicted murderers—escape from prison, armed them with shotguns, helped flag down and kidnap a family on an isolated road, drove the family to a remote site, and then stood by as their father and his cellmate murdered the four family members. 481 U.S. at 139–41. The Court concluded that the *Tison* brothers' major participation in the crimes distinguished them from Enmund. *Id.* at 151–52. The Court noted that the *Tison* defendants: (1) "actively participated in the events leading to the death by, *inter alia*, providing the murder weapons and helping abduct the victims"; (2) were "present at the murder site, [and] did nothing to interfere with the murders"; (3) "ma[de] no effort to assist the victims before, during, or after the shooting"; (4) "after the murders . . . continued on the joint venture"; and (5) "could anticipate the use of lethal force" during the commission of their crimes. *Id*. at 145, 151 (internal quotation marks omitted).

In this case, the Arizona court's application of federal law was not objectively unreasonable. Indeed, Dickens

participated in the crimes to nearly the same extent as the *Tison* defendants. As in *Tison*, Dickens participated in the events leading up to the death, because he "suggested they plan a robbery," "[t]he robberies were premeditated, planned, and agreed on by [Dickens] and Amaral," and "[Dickens] drove Amaral to the scene." *Dickens*, 926 P.2d at 474, 490. Dickens was present at the murder site and did not interfere with the murders since Dickens "wait[ed] and watch[ed] for approximately three hours" for the victims to arrive and then "[Dickens] waited while Amaral committed the robberies." *Id*. at 474, 490. Dickens made no effort to assist the victims but rather "picked up Amaral" after the crime "then drove to the home of [his] brother." *Id*. at 475. Dickens continued the joint venture when he "witnessed the destruction of evidence, and failed to report the crimes." *Id*. at 490. And finally, Dickens could have anticipated that Amaral would use lethal force since "[Dickens] furnished Amaral with the weapon used in the murders or knew Amaral had the weapon with him for the robberies." *Id*. In short, Dickens was actively involved in every aspect of the deadly crime—suggesting they undertake the robbery, planning the robbery, staking out the crime scene, selecting the victims, arming Amaral with a handgun,[9] watching the murders, aiding Amaral's escape,

---

[9] The Arizona Supreme Court's decision is (arguably) vague as to whether Dickens armed Amaral. The Arizona Supreme Court, in its "Death eligibility" discussion, noted only that Dickens either furnished the weapon or knew Amaral had the weapon. *Dickens*, 926 P.2d at 490. However, it is irrelevant whether Dickens actually handed Amaral the gun in the moments before the Bernsteins' robbery and murder. Dickens does not dispute that he owned the gun and showed it to Amaral prior to the crimes. As such, Dickens "furnished" the gun by owning it, showing it to Amaral, and either giving it to him or knowingly allowing him to use it for the crimes.

destroying evidence, and helping Amaral evade capture. Dickens was clearly a major participant in the crime.

Nonetheless, Dickens insists his conduct was more akin to the defendant in *Enmund* than to the defendants in *Tison*. While we disagree for the reasons stated above, more importantly, Dickens's argument overlooks the deference we owe the Arizona Supreme Court's decision under AEDPA. At the very least, reasonable minds could differ as to whether Dickens's participation level is closer to the defendant in *Enmund* than the defendants in *Tison*. *See Richter*, 131 S. Ct. at 786. *Tison* does not illuminate the precise line where a defendant's conduct becomes "major participation." Thus, even assuming that Dickens's conduct falls into a "grey area" between *Enmund* and *Tison*, we must defer to the Arizona Supreme Court's conclusion. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam) ("Because [Supreme Court precedent] give[s] no clear answer to the question presented . . . it cannot be said that the state court unreasonably applied clearly established Federal law." (internal quotation marks and alterations omitted)).

One of Dickens's arguments in particular illustrates AEDPA's effect on his claim. Dickens argues that *Enmund* and *Tison* require a defendant's immediate physical presence at the murder scene to qualify for the death penalty. Dickens bases this argument on an arguable distinction between this case and *Tison*: the Tison brothers were apparently in closer proximity to the killings than Dickens. *See* 481 U.S. at 141, 144–45. However, nowhere in *Enmund* or *Tison* does the Supreme Court clearly establish that "presence" at a murder scene is a mandatory prerequisite for the death penalty. Instead, physical presence is merely one of several factors relevant to the "major participation" prong of the *Tison*

analysis. *Id.* at 158. The *Tison* court never stated that one factor was more important than another factor. Rather, it simply concluded that the defendants' actions collectively demonstrate a "high level of participation . . . [that] implicates them in the resulting deaths." *Id.*

Here, the Arizona Supreme Court considered Dickens's "presence" at the murder scene along with the other relevant factors. *See Dickens*, 926 P.2d at 490. Its failure to give the presence factor any particular weight relative to any other factor demonstrating Dickens's "high level of participation" in the crimes did not violate clearly established federal law. Thus, we cannot say that the Arizona Supreme Court's decision was objectively unreasonable, regardless of whether *Tison* is distinguishable from Dickens's case on the "presence" factor.

Furthermore, even if "presence" were the dispositive factor in the "major participant" analysis, Dickens would face an additional AEDPA hurdle. The Supreme Court has never defined "presence" as it pertains to major participation in a capital crime. As a result, the Arizona Supreme Court had only the two contrasting examples of presence in *Enmund* and *Tison* to guide its reasoning. In *Enmund*, where the defendant sat in a car outside the home where two victims were shot to death and neither heard nor observed the murders, the Court concluded that the defendant "was not present when the killing took place." 458 U.S. at 795. However, in *Tison*, where the defendants stood by as four people were gunned down, the Court determined the defendants were "present" at

the murder site. 481 U.S. at 145.[10] The lack of any Supreme Court precedent defining "presence" requires us to give the Arizona Supreme Court some "leeway" in making its determination. *See Richter*, 131 S. Ct. at 786.

Here, the Arizona Supreme Court suggested that Dickens's presence at the murder scene—combined with his other actions leading up to and following the crimes—qualified him as a major participant. *See Dickens*, 926 P.2d at 490. The record demonstrates that this was not an unreasonable conclusion. Dickens testified at trial that he watched, as the Tison brothers presumably did, each part of the Bernsteins' murders as they unfolded. Dickens saw the Bernsteins pull into the rest stop. After selecting the Bernsteins as the victims, Dickens nodded his head and watched Amaral walk across the highway with a loaded .38-caliber handgun, knowing Amaral was going to rob the Bernsteins at gunpoint. He was close enough to see Amaral moving the Bernsteins around the front of their car in the path of the illuminated headlamps and to see flashes as Amaral shot the victims in the head. Then, rather than merely acting as the getaway driver, Dickens drove through the rest stop to, in his words, verify that "everything was taken care of" and pick up Amaral. Thus, the Arizona Supreme Court did not

---

[10] There was apparently some dispute as to the *Tison* defendants' involvement in, and proximity to, the murders: "Ricky claimed to have a somewhat better view than Raymond did of the actual killing. Otherwise, the [Arizona] court noted, Ricky Tison's participation was substantially the same as Raymond's." 481 U.S. at 145. The defendants may have actually walked *away* from the murder scene to fetch a water jug for the victims "when [they] started hearing the shots." *Id.* at 141. However, because both defendants "*watched* Gary Tison and Greenawalt fire in the direction of the victims," they were "present" at the murder scene. *Id.* at 141, 144–45, 157 (emphasis added).

unreasonably conclude that Dickens was a major participant in the Bernsteins' robbery and murder.[11]

## B. Reckless indifference to human life

The second prong of the *Tison* analysis requires the felony-murder defendant to exhibit "reckless indifference to human life" sufficient to satisfy *Enmund*'s culpability requirement for capital punishment. 481 U.S. at 158. The *Tison* Court observed that

> some nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the

---

[11] At the en banc oral argument, Dickens argued that, because Enmund was found not present at the scene of the murders when he was 200 yards away, and Dickens was approximately 199 yards from the murders, Dickens could not have been present at the scene. However, this argument is not supported by the record. We know that Dickens got much closer: While the crime was still ongoing—and while at least one of the victims was still alive—Dickens "drove across the median to the westbound lanes, where he picked up Amaral." *Dickens*, 926 P.2d at 475. Unlike Enmund, who sat "waiting to help the robbers escape," *Enmund*, 458 U.S. at 788, Dickens drove toward the scene, not to aid the victims, but "to aid those whom he had placed in the position to kill." *Tison*, 481 U.S. at 152. It is unclear from the record exactly how close Dickens was, but it was certainly much less than 200 yards.

In any event, the Supreme Court has never defined a set distance between the defendant and the murders to constitute presence. Determining whether a defendant was present based solely on how many yards the defendant was from the crime ignores important contextual factors.

> desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill."

*Id*. at 157. The *Tison* court further held that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state" sufficient to warrant capital punishment "when that conduct causes its *natural, though also not inevitable, lethal result*." *Id*. at 157–58 (emphasis added).

Applying *Tison*, the Arizona Supreme Court concluded that Dickens acted with a reckless indifference to human life, because, in addition to the factors demonstrating his major contribution to the crimes, Dickens armed Amaral with the .38-caliber revolver, knowing that "Amaral had a violent and explosive temper," and "failed to render aid" to the Bernsteins. *Dickens*, 926 P.2d at 490. Given these facts, the Arizona Supreme Court concluded that Dickens exhibited a reckless indifference to human life.

Dickens argues that this conclusion was unreasonable, because armed robbery is not a crime "known to carry a grave risk of death." However, Dickens cites no U.S. Supreme Court precedent, and we know of none, clearly establishing this principle. Moreover, even if the garden variety armed robbery were not known to carry a grave risk of death, the question here is whether the circumstances of Dickens's crime carried a grave risk of death and caused their "natural,

though also not inevitable, lethal result." *Tison*, 481 U.S. at 158.

The facts support the Arizona Supreme Court's determination that Dickens knew there was a grave risk of death in sending an explosive adolescent with a history of violence to commit armed robbery. From his experience working at the Oak Grove Institute (a treatment center for violent juveniles), Dickens knew that Amaral was a high risk patient with a "violent and explosive temper." *Dickens*, 926 P.2d at 490. He knew that Amaral had battered a nurse at Oak Grove and had a long history of carrying guns. He knew that Amaral was reckless in his handling of guns since Amaral twice attempted to intimidate Dickens—once at the river and once immediately before the robbery—by pointing the loaded .38-caliber revolver at Dickens's head. He knew that Amaral had bragged about being involved in other murders. Yet even with this knowledge, Dickens proceeded with the robbery. He either furnished Amaral with his .38-caliber revolver or knew Amaral had the gun, and stood by while Amaral left with the gun to rob the Bernsteins on the opposite side of the highway. Like the defendants in *Tison*, who armed two convicted murderers and helped plan and orchestrate the armed robbery, Dickens "could have foreseen that lethal force might be used" in the course of the robbery. 481 U.S. at 151–52; *accord Foster v. Quarterman*, 466 F.3d 359, 370–71 (5th Cir. 2006) (denying habeas relief to a death row petitioner because he displayed reckless indifference to human life by driving two armed co-conspirators from victim to victim to commit armed robbery, a criminal activity "known to carry a grave risk of death").

Furthermore, after watching the shootings, Dickens, like the defendants in *Tison*, chose to "aid [Amaral,] whom he had

placed in the position to kill rather than [aid] their victims."
*Tison*, 481 U.S. at 152; *see id*. ("These facts not only indicate
that the Tison brothers' participation in the crime was
anything but minor; they also would clearly support a finding
that they both subjectively appreciated that their acts were
likely to result in the taking of innocent life."). Dickens
helped Amaral flee the scene of the murder, destroy evidence,
and evade capture. In light of these facts, we cannot say that
the Arizona Supreme Court's determination that Dickens
exhibited a reckless indifference to human life rested on an
objectively unreasonable application of *Enmund* and *Tison*.

## II. The Arizona Supreme Court's decision was not based on an unreasonable determination of fact.

To avoid the bar against granting habeas relief imposed
by § 2254(d)(2), a defendant must show the state court's
conclusion "to be 'an unreasonable determination of the facts
in light of the evidence presented in the State court
proceeding.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)
(quoting 28 U.S.C. § 2254(d)(2)). A trial court's findings are
presumed sound unless the defendant rebuts the "presumption
of correctness by clear and convincing evidence." 28 U.S.C.
§ 2254(e)(1).

Dickens argues that he is entitled to relief because the
Arizona court's *Enmund/Tison* analysis was based on an
unreasonable determination of the facts. More specifically,
Dickens argues that the state court unreasonably determined
that: (1) Amaral was a sufficiently credible witness;
(2) Dickens knew Amaral intended to rob or kill the
Bernsteins; (3) Dickens knew of Amaral's violent
propensities; and (4) Dickens knew one of the Bernsteins
might still be alive when he left the rest area.

We reject Dickens's claim arising from Amaral's alleged lack of credibility. To support this claim, Dickens alleges that Amaral made inconsistent statements, Amaral's fellow prisoners gave contradictory testimony, and the jury rejected Amaral's testimony about an alleged walkie-talkie conversation between Dickens and Amaral at the murder scene.[12] Aside from casting doubt on Amaral's credibility—a factor which the state court and jury no doubt considered at trial[13]—these general allegations do little more than attempt to relitigate the jury's factual findings and credit Dickens's testimony (over that of Amaral) that he had no part in the crimes. Because we must "defer to the jury and the [trial] judge regarding Amaral's credibility" unless there is persuasive evidence that any particular determination of fact was unreasonable, Dickens cannot prevail under § 2254(d)(2) by raising a general challenge to Amaral's credibility. *Dickens*, 926 P.2d at 490; *see United States v. Johnson*, 229 F.3d 891, 894 (9th Cir. 2000) ("[W]e are powerless to question a jury's assessment of witnesses' credibility . . . ." (internal quotation marks omitted)).

We also reject Dickens's claims arising from the alleged insufficiency of evidence at trial. Ample evidence supported the conclusion that Dickens knew that Amaral intended to rob

---

[12] Amaral's testimony regarding the walkie-talkie conversation (in which Dickens allegedly instructed Amaral not to leave any witnesses) is irrelevant because neither the trial court nor the Arizona Supreme Court relied on this testimony in their discussion of the evidence supporting the *Enmund/Tison* findings. *See Dickens*, 926 P.2d at 490–91.

[13] For example, the jury did not convict Dickens of premeditated murder or conspiracy to commit murder, indicating it likely did not believe Amaral's testimony that Dickens ordered him to kill the Bernsteins over a two-way radio.

the Bernsteins. Dickens himself testified that he knew about the robbery. Most significantly, he admitted that he "figured [Amaral] was going to . . . go over there and rob those people," and that Amaral told him he was going to rob the Bernsteins. Moreover, Amaral testified at length about their common scheme to commit armed robbery. Dickens has not explained why the Arizona courts' reliance on this particular testimony from Amaral was unreasonable. In light of this evidence, the Arizona Supreme Court's determination that Dickens knew about and agreed to the robbery was not unreasonable.

Similarly, the record supports the Arizona courts' determination that Dickens knew about Amaral's violent propensities. Dickens originally met Amaral at the Oak Grove Institute for violent juveniles. Dickens learned, while working at Oak Grove, that Amaral was a "high risk" patient, had battered a nurse, and frequently bragged about carrying guns and committing violent crimes, including murder. He further testified that he had personally seen Amaral carrying guns on several occasions before the September 1991 murders. Lastly, Amaral pointed a .38-caliber revolver at Dickens's head on two separate occasions to intimidate him. One occasion was just prior to the robbery. In light of Dickens's own admissions, we cannot say the Arizona Supreme Court's determination that Dickens knew of Amaral's violent nature was unreasonable.

Finally, the facts support the Arizona courts' determination that Dickens "failed to render aid knowing that one victim might not be dead" and thus exhibited reckless indifference to human life. *Dickens*, 926 P.2d at 490. However, it was not necessary to the Arizona court's reckless indifference finding that Dickens knew that "one victim

might not be dead."   In *Tison*, the U.S. Supreme Court concluded that the defendants exhibited reckless indifference, in part, because they "watched the killing" and then "chose to aid those whom [they] had placed in the position to kill rather than their victims."   481 U.S. at 152.   Nothing suggests the defendants in *Tison* knew anyone had survived.   Rather, the relevant factors were the defendants' knowledge that victims had been shot and their decision to aid the shooters over the victims.

Dickens, like the *Tison* defendants, watched Amaral shoot the Bernsteins, but decided to aid Amaral over the Bernsteins by picking him up and driving him to his brother's home. There is no evidence that Dickens attempted to aid the Bernsteins, summon medical assistance, or otherwise notify the authorities.    Instead, he helped Amaral.    Because Dickens's   uncontested   knowledge   of   the   Bernsteins' shooting, rather than Bryan's survival, is the critical factor in the *Enmund/Tison* reckless indifference analysis, the Arizona Supreme Court did not "base" its decision on an unreasonable determination of the facts.   *See* 28 U.S.C.   § 2254(d)(2).[14]

---

[14] Evidence in the record also supports this factual determination.  For example, Amaral testified that Dickens drove through the rest stop to verify that "everything had been taken care of."   Officers testified that, when they arrived at the rest stop shortly after the shooting, Bryan Bernstein was still alive and "thrashing" around in pain.   At a minimum, Dickens failed to provide aid when one victim was, in fact, still alive.

**III.   Dickens defaulted on his IAC claim by failing to fairly present the claim to the Arizona courts, but he may be able to show "cause" under *Martinez v. Ryan.***

Dickens lastly petitions this court for habeas relief on the basis of his counsel's ineffective assistance during sentencing. Dickens argues his counsel failed to conduct a thorough investigation of Dickens's background and prepare the defense expert with the necessary tools to present compelling mitigation evidence. Dickens claims that trial counsel should have obtained and introduced additional mitigating evidence, including evidence that Dickens suffered from organic brain damage and FAS.

"A federal court may not grant habeas relief to a state prisoner unless he has properly exhausted his remedies in state court." *Peterson v. Lampert*, 319 F.3d 1153, 1155 (9th Cir. 2003) (en banc) (citing 28 U.S.C. § 2254(b)); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991)). To demonstrate that he exhausted his federal habeas corpus claim in state court, Dickens's claim presented in state court "must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle [him] to relief." *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996). An unexhausted claim will be procedurally defaulted, if state procedural rules would now bar the petitioner from bringing the claim in state court. *See Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002).

Here, we conclude that Dickens's claim is procedurally defaulted, because he never presented it to the state courts and would now be barred from doing so. However, remand

is appropriate to allow the district court to evaluate whether Dickens can show cause and prejudice under *Martinez*.

## A.  Background

Dickens argued to the Arizona trial court that his sentencing counsel provided ineffective assistance.  Dickens claimed, among other things, that sentencing counsel did not direct the work of the court-appointed psychologist and did not adequately investigate Dickens's background.  The trial court rejected this claim on the merits, finding that sentencing counsel's performance was not constitutionally deficient and that Dickens "failed to demonstrate that he was prejudiced by any performance of defense counsel."  Considering the same arguments raised to the trial court, the Arizona Supreme Court summarily denied Dickens's *Strickland* claim on appeal.

In federal court, Dickens changed his claim to include extensive factual allegations suggesting Dickens suffered from FAS and organic brain damage.  Dickens argued that sentencing counsel's failure to uncover and present these specific mitigating conditions amounted to constitutionally deficient performance.   The state argued that Dickens procedurally defaulted any claim based on these new allegations by failing to present the allegations and evidence to the state court.

The district court agreed with the state's procedural default argument.  The district court noted that "[f]actual allegations that were not presented to the state court may render a claim unexhausted if the allegations 'fundamentally alter'" the claim presented to the state court. *See Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).  The district court also

observed that "[n]ew evidence fundamentally alters a claim if it places the claim in a significantly different and stronger evidentiary posture than it had in state court." *Aiken v. Spalding*, 841 F.2d 881, 883, 884 n.3 (9th Cir. 1988). The district court concluded that Dickens's new allegations and proffered evidence fundamentally altered his previously exhausted IAC claim, rendering it "partially unexhausted and procedurally defaulted."

The district court also rejected Dickens's argument that ineffective assistance of his post-conviction relief ("PCR") counsel constituted "cause" to overcome the procedural default. The district court reasoned that Dickens had no constitutional right to effective PCR counsel, making it insufficient to show cause under *Coleman v. Thompson*, 501 U.S. 722 (1991). Thus, the district court declined to reach the merits of Dickens's "new" IAC claim and denied Dickens's request for an evidentiary hearing.

Dickens challenged the district court's conclusion concerning exhaustion and cause before the three judge panel of this court. The state maintained its position that Dickens failed to exhaust the "new" IAC claim, rendering it procedurally defaulted. However, after this case was submitted, the Supreme Court decided *Martinez*. In *Martinez*, the Court modified "the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." 132 S. Ct. 1309, 1315 (2012). *Martinez* created a narrow exception to *Coleman* whereby "[i]nadequate assistance of counsel at initial-review collateral

proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."**15**  *Id.*

The panel ordered the parties to address the effect of *Martinez* on Dickens's "new" IAC claim.  The panel rejected the state's various arguments that *Martinez*  does not apply to Dickens's claim.  The panel unanimously decided to remand the case to the district court to consider whether Dickens could show cause to overcome his procedural default.  For the reasons stated below, we too conclude that remand is appropriate under *Martinez*.

### B. Although Dickens procedurally defaulted his "new" IAC claim, Dickens may be able to show cause and prejudice under *Martinez*.

#### 1.  Fair presentation in state court

As an initial matter, we agree with the district court that Dickens failed to exhaust his "new" IAC claim.  To exhaust a constitutional claim, the claim must be "fairly present[ed]" in state court to provide the state courts an opportunity to act on them.  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam).  A claim has not been fairly presented in state court if new factual allegations either "fundamentally alter the legal claim already considered by the state courts," *Vasquez*, 474 U.S. at 260; *Beaty*, 303 F.3d at 989–90, or "place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it."  *Aiken*,

---

**15** *Martinez* defines an initial-review collateral proceedings as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial."  *Martinez*, 132 S. Ct. at 1315.

841 F.2d at 883; *accord Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988).

In *Aiken*, the habeas petitioner presented new evidence consisting of a decibel sound test performed by an expert which strengthened his claim that the interrogating officers heard him request counsel. 841 F.2d at 883. The court held that his right to counsel claim was unexhausted, because the new decibel evidence "substantially improve[d] the evidentiary basis for [his] right-to-counsel and voluntariness arguments, thereby presenting the very type of evidence which the state should consider in the first instance."[16] *Id*.

Similarly, in *Nevius*, this Court held that a habeas petitioner failed to exhaust his *Batson* claim in state court where he attempted to introduce new and substantial supporting evidence on appeal. 852 F.2d at 469–70. At oral argument and in his appellate briefs, Nevius made allegations concerning comments the prosecutor allegedly made to defense counsel. The comments, "if proven, might have presented in a different light the factual issues concerning the motivation of the prosecutor in exercising his peremptory challenges." *Id*. at 470. However, because the alleged

---

[16] Our holdings in *Aiken* and *Nevius* are consistent with case law in other circuits. *See, e.g.*, *Smith v. Quarterman*, 515 F.3d 392, 402 (5th Cir. 2008) (dismissing habeas petition for failure to exhaust because new evidence "regarding [petitioner]'s childhood and the effects of his substance abuse . . . constitute 'material additional evidentiary support [presented] to the federal court that was not presented to the state court'" (citation omitted)); *Demarest v. Price*, 130 F.3d 922, 938–39 (10th Cir. 1997) (finding failure to exhaust because "new evidence submitted to the district court by [the petitioner] transformed his ineffective assistance of counsel claim into one that was 'significantly different and more substantial'" (citation omitted)).

remarks were not previously presented in a state court, this court found that the claims were unexhausted and not addressable in federal court.

We conclude that the new allegations and evidence Dickens presented to the federal district court fundamentally altered Dickens's previously exhausted IAC claim. Indeed, the new evidence creates a mitigation case that bears little resemblance to the naked *Strickland* claim raised before the state courts. There, Dickens did not identify any specific conditions that sentencing counsel's allegedly deficient performance failed to uncover. He only generally alleged that sentencing counsel did not effectively evaluate whether Dickens "suffer[ed] from any medical or mental impairment." This new evidence of specific conditions (like FAS and organic brain damage) clearly places Dickens's *Strickland* claim in a "significantly different" and "substantially improved" evidentiary posture. *See Nevius*, 852 F.2d at 470; *Aiken*, 841 F.2d at 883. As such, the Arizona courts did not have a fair opportunity to evaluate Dickens's altered IAC claim. Therefore, the district court correctly determined that Dickens's newly enhanced *Strickland* claim is procedurally barred.

### 2.  Cause and Prejudice under *Martinez*

*Martinez* announced an exception to the longstanding *Coleman* rule that ineffective assistance of PCR counsel cannot establish cause to overcome procedural default. 132 S. Ct. at 1315. The Supreme Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a

> procedural default will not bar a federal
> habeas court from hearing a substantial claim
> of ineffective assistance at trial if, in the initial
> review collateral proceeding, there was no
> counsel or counsel in that proceeding was
> ineffective.

*Id.* at 1320. As such, to establish "cause" to overcome procedural default under *Martinez*, a petitioner must show: (1) the underlying ineffective assistance of trial counsel claim is "substantial"; (2) the petitioner was not represented or had ineffective counsel during the PCR proceeding; (3) the state PCR proceeding was the initial review proceeding; and (4) state law required (or forced as a practical matter) the petitioner to bring the claim in the initial review collateral proceeding. *Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013).

Here, there is no dispute with respect to elements (3) and (4), because Arizona does not permit a petitioner to bring an IAC claim on direct appeal. *Martinez*, 132 S. Ct. at 1313, 1320. Arizona law requires a petitioner to bring such a claim in a collateral review proceeding. *Id.* The district court, applying the law as it stood at that time, correctly held that Dickens could not establish cause for his procedural default based on the alleged ineffectiveness of his PCR counsel. However, *Martinez* may provide a path for Dickens to demonstrate cause, if he can show the first two *Martinez* elements: (1) the claim is substantial and (2) that his PCR counsel was ineffective under *Strickland*. Thus, we vacate the district court's ruling regarding whether cause existed to overcome the procedural default of Dickens's newly-enhanced claim of ineffective assistance of sentencing counsel. We remand for the district court to consider the issue anew in light of *Martinez*. *See Strategic Diversity, Inc.*

*v. Alchemix Corp.*, 666 F.3d 1197, 1206 (9th Cir. 2012) ("Because the district court did not have the benefit of recent Supreme Court authority, we vacate the ruling on these grounds and remand.").

The state presents various arguments to convince us that Dickens is not entitled to remand under *Martinez* and that our conclusion would contravene *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), which the Supreme Court decided during the pendency of this appeal. We decline to address many of these arguments based on our remand regarding the applicability and impact of *Martinez*. However, we provide guidance to the district court on the following points: (a) *Pinholster*'s potential effect on Dickens's "new" IAC claim; (b) the effect of Dickens's other IAC claims on the "new" claim; and (c) whether § 2254(e)(2) bars Dickens's request for an evidentiary hearing on remand.

### a. *Pinholster*

We reject any argument that *Pinholster* bars the federal district court's ability to consider Dickens's "new" IAC claim. The state argues that the district court cannot consider new allegations or evidence proffered for the first time to the district court. In *Pinholster*, the Supreme Court made clear that a federal habeas court may not consider evidence of a claim that was not presented to the state court. 131 S. Ct. at 1398. However, this prohibition applies only to claims previously "adjudicated on the merits in State court proceedings." *Id.* at 1401; *see also* 28 U.S.C. § 2254(d).

*Pinholster* does not bar Dickens from presenting evidence of his "new" IAC claim, because the claim was not "adjudicated on the merits" by the Arizona courts. While the

Arizona courts did previously adjudicate a similar IAC claim, the new allegations and evidence "fundamentally altered" that claim, as discussed above. *See, e.g.*, *Aiken*, 841 F.2d at 883. *Pinholster* says nothing about whether a court may consider a "new" claim, based on "new" evidence not previously presented to the state courts. *See* 131 S. Ct. at 1401 n.10. Indeed, the *Pinholster* court expressly declined to "decide where to draw the line between new claims and claims adjudicated on the merits." *Id.* Thus, *Pinholster* does not affect earlier cases like *Vasquez*, *Aiken*, and *Nevius*, or a federal habeas court's ability to consider new evidence where the petitioner successfully shows cause to overcome the procedural default.

### b. Dickens's "Other" IAC Claims

We reject the similar argument that Dickens's other IAC claims, which were previously "adjudicated on the merits" by the Arizona Courts, foreclose the new IAC claim. *Martinez* allows a petitioner to argue "cause" based on PCR counsel's ineffectiveness for counsel's failure to raise a substantial trial counsel IAC claim. 132 S. Ct. at 1318–19. *Martinez* contains no language limiting this "equitable exception" simply because a petitioner brought other IAC claims that were exhausted. *See id.* Because courts evaluate procedural default on a claim-by-claim basis, it follows that *Martinez* would allow a petitioner to show cause, irrespective of the presence of other, separate claims.

### c. Dickens's Request for an Evidentiary Hearing

We also reject the state's argument that, even if *Martinez* applies to the standard for Dickens to show cause,

§ 2254(e)(2) will bar Dickens from introducing the new evidence to the district court. Petitioners seeking habeas relief cannot obtain an evidentiary hearing on their claims unless they comply with § 2254(e)(2). Section 2254(e)(2) severely restricts a petitioner's ability to obtain a hearing on a claim for relief where the petitioner "failed to develop the factual basis of a claim in State court proceedings" due to "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *See Lopez v. Ryan*, 630 F.3d 1198, 1206 (9th Cir. 2011). A petitioner's attorney's "fault" is generally attributed to the petitioner for purposes of § 2254(e)(2)'s diligence requirement. *See Williams v. Taylor*, 529 U.S. 420, 437–40 (2000).

Section 2254(e)(2), however, does not bar a hearing before the district court to allow a petitioner to show "cause" under *Martinez*. When a petitioner seeks to show "cause" based on ineffective assistance of PCR counsel, he is not asserting a "claim" for relief as that term is used in § 2254(e)(2); indeed, such a claim of ineffective assistance of PCR counsel is not a constitutional claim. *See Martinez*, 132 S. Ct. at 1319–20. Instead, the petitioner seeks, on an equitable basis, to excuse a procedural default. *See id*. A federal court's determination of whether a habeas petitioner has demonstrated cause and prejudice (so as to bring his case within *Martinez*'s judicially created exception to the judicially created procedural bar) is not the same as a hearing on a constitutional claim for habeas relief. *See Coleman*, 501 U.S. at 750 (recognizing the "cause and prejudice" exception to procedural default); *Woodford v. Ngo*, 548 U.S. 81, 91 (2006) ("[H]abeas law includes the judge-made doctrine of procedural default"); *Dretke v. Haley*, 541 U.S. 386, 394 (2004) (describing the "various exceptions to the procedural default doctrine" as "judge-made rules").

Therefore, a petitioner, claiming that PCR counsel's ineffective assistance constituted "cause," may present evidence to demonstrate this point.  The petitioner is also entitled to present evidence to demonstrate that there is "prejudice," that is that petitioner's claim is "substantial" under *Martinez*.  Therefore, a district court may take evidence to the extent necessary to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*.

The facts and procedural posture of Dickens's case illustrate this point.  Dickens had a new claim of ineffective assistance of counsel.  Because the claim was new, it was procedurally defaulted (thus technically exhausted). However, if Dickens can show cause and prejudice to excuse a procedural default, AEDPA no longer applies and a federal court may hear this new claim de novo.  *Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002).  *Martinez* may provide a means to show "cause" to overcome the default and reach the merits of the new claim.  Because § 2254(e)(2) by its terms does not prevent consideration of the substantive evidence of the claim to the extent necessary to determine if Dickens has successfully proven "cause," Dickens will have a fair opportunity to show cause and prejudice so as to overcome the procedural bar of the otherwise defaulted claim.  *See Martinez*, 132 S. Ct. at 1317.[17]  Thus, § 2254(e)(2) does not

---

[17] The state argues that *Martinez* does not apply, because the assertion of ineffective assistance of PCR counsel as cause must itself be exhausted or it is procedurally barred.  It is true that "the exhaustion doctrine . . . generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."  *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986) (citation omitted).  However, the case law in light of *Martinez* now indicates that there is no requirement that a petitioner assert an ineffective

bar a cause and prejudice hearing on Dickens's claim of PCR counsel's ineffectiveness, which requires a showing that Dickens's underlying trial-counsel IAC claim is substantial.

## CONCLUSION

For the foregoing reasons, the judgment of the district court denying Dickens's petition for writ of habeas corpus is

**AFFIRMED in part, VACATED in part, and REMANDED.**

The parties shall bear their own costs.

---

Chief Judge KOZINSKI, with whom Judges BYBEE and CALLAHAN join, concurring in part:

I agree with the majority that the Arizona Supreme Court didn't unreasonably apply the relevant Eighth Amendment precedent—*Enmund* v. *Florida*, 458 U.S. 782 (1982), and *Tison* v. *Arizona*, 481 U.S. 137 (1987)—in affirming Dickens's death sentence. *See* Maj. Op. Parts I & II. I write

---

assistance of PCR counsel claim as cause in state court in order to demonstrate cause in federal court. In *Martinez*, the first time the petitioner argued ineffective assistance of PCR counsel was in his federal habeas petition. *See Martinez*, 132 S. Ct. at 1314; *Martinez v. Schriro*, 623 F.3d 731, 734 (9th Cir. 2010), *rev'd by Martinez*, 132 S. Ct. 1309. The Supreme Court did not find the claim barred for not being presented to the state courts. Therefore, where *Martinez* applies, there seems to be no requirement that the claim of ineffective assistance of PCR counsel as cause for an ineffective-assistance-of-sentencing-counsel claim be presented to the state courts.

separately because I believe the Arizona Supreme Court's application of *Enmund* and *Tison* was more than just reasonable—it was entirely correct.

In *Enmund*, the Supreme Court overturned a getaway driver's death sentence because there was no evidence that he killed, attempted to kill or intended the death of the victim. *Enmund*, 458 U.S. at 796–98. As best the record showed, Enmund was a schmo hired to drive the getaway car for a robbery gone wrong; there was no evidence that he planned or otherwise participated in the crime. *Id.* at 786. Five years later, *Tison* held that two brothers who played major roles in a violent jailbreak and kidnaping *could* be sentenced to death, even though the brothers didn't intend or expect that anyone would be killed. *Tison*, 481 U.S. at 158. The Court held that a major participant in a deadly crime may be sentenced to death if he acted with reckless indifference to human life. *Id.*

*Enmund* and *Tison* lay out a simple rule: A felony-murderer may be death-eligible if he kills intentionally or acts with reckless indifference. If sentenced under a recklessness theory, he must also have been a major participant in the felony that resulted in the victim's death. *Id.* The Arizona Supreme Court found that Dickens didn't intend to kill but that he was both recklessly indifferent to human life *and* a major participant in the underlying felony. *State* v. *Dickens*, 926 P.2d 468, 490 (Ariz. 1996). As I see it, the Arizona Supreme Court followed *Tison* to the letter in affirming Dickens's death sentence.

Yet five of my esteemed colleagues find this result to be not just wrong but unreasonable. *See* Christen Dissent. For them, *Tison* is but a "narrow exception to the *Enmund* rule" that only those who kill or intend to kill can be sentenced to

death. *Id.* at 78. Dickens doesn't fit into this narrow exception, my colleagues believe, because his crime was more like that of Earl Enmund (who, like Dickens, drove the getaway car) than the Tison brothers. *Id.* at 74; *see also id.* at 88. Because *Enmund* set aside a getaway driver's death sentence, my colleagues find it unreasonable to reach a different result in our case. *Id.* at 77–78 ("The Arizona Supreme Court's decision to affirm the death penalty in Dickens's case contravenes clearly established law set out in *Enmund*.").

But the dissenters' fact-specific reading of *Enmund* and *Tison* is incorrect: To the extent *Enmund* suggested that only intentional murderers may be sentenced to death, *Tison* overruled it. More specifically, *Tison* made clear that getaway drivers *can* be sentenced to death; they just can't be sentenced to death if *all* they do is to serve as getaway drivers. As the *Tison* Court put it, *Enmund* prohibits "imposition of the death penalty for felony murder *simpliciter*," 481 U.S. at 147, but this doesn't mean a showing of intent to kill is required in every case; the Eighth Amendment may also be satisfied by showing reckless indifference to human life. *Id.* at 157 ("A narrow focus on the question of whether or not a given defendant 'intended to kill,' . . . is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers."). To conclude that Dickens can't be sentenced to death because his *conduct* more "closely resembles the actions of Earl Enmund" than the Tison brothers, Christen Dissent at 74, misses the point of *Tison*: The State made no showing that Enmund was reckless because it (mistakenly) thought he could be sentenced to death on a strict liability felony-murder theory. *Enmund*, 458 U.S. at 786.

The evidence shows that Dickens easily satisfies *Tison*'s culpability requirements:  He planned an armed robbery, convinced an unstable and violent teenager to carry it out, watched the crime transpire, picked up his confederate after the shootings, fled the scene and destroyed evidence. *State* v. *Dickens*, 926 P.2d at 474–75; *see also* Maj. Op. at 5–10. More than just technically establishing Dickens's death-eligibility, the harrowing facts proved at trial fit squarely within *Tison*'s rationale:  Such reckless murderers are "among the most dangerous and inhumane of all," and their indifference to human life is "every bit as shocking to the moral sense as an 'intent to kill.'" *Tison*, 481 U.S. at 157.  I therefore agree with the Arizona Supreme Court that Dickens's death sentence was appropriate under *Tison*.

Nonetheless, eleven thoughtful, conscientious judges came to (at least) three disparate conclusions on this issue. *See* Christen Dissent at 75–89 (state court was unreasonable); Watford Concurrence (state court was incorrect but reasonable); Maj. Op. at 14–26 (state court wasn't unreasonable); Kozinski Concurrence (state court was correct).  The fact that decades after *Tison* we still have such sharp disagreement about what it means suggests that *Enmund* is a hazard to navigation and should be overruled. We can't do this, but the Supreme Court can and should.

WATFORD, Circuit Judge, concurring:

I join the majority's opinion, except to the extent that it suggests the Arizona Supreme Court correctly applied *Tison v. Arizona*, 481 U.S. 137 (1987), and *Enmund v. Florida*, 458 U.S. 782 (1982), to the facts of Dickens' case.  I agree

with the majority that the Arizona Supreme Court's application of those precedents wasn't "unreasonable" under 28 U.S.C. § 2254(d)(1). As construed by the United States Supreme Court, § 2254(d)(1) allows us to grant relief only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the] Court's precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). I view that standard as functionally equivalent to the standard developed under *Teague v. Lane*, 489 U.S. 288 (1989); it will seldom (if ever) be satisfied unless the petitioner shows that the Supreme Court's cases "dictate the result" urged by the petitioner. *Saffle v. Parks*, 494 U.S. 484, 490 (1990). As the majority explains, neither *Tison* nor *Enmund* dictates the result in Dickens' case. His case falls in the gap between those two precedents, and fairminded jurists could expand either *Enmund*'s general rule or *Tison*'s exception to encompass Dickens' conduct.

In these circumstances, the Supreme Court has held that we must give "deference" to the Arizona Supreme Court's interpretation of *Tison* and *Enmund*, even if we believe the state court's interpretation is erroneous. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Had we been permitted instead to grant relief based on our own "independent evaluation" of those precedents, *Wright v. West*, 505 U.S. 277, 305 (1992) (O'Connor, J., concurring in the judgment), I would have held that the Eighth Amendment bars Dickens' execution.

CALLAHAN, Circuit Judge, joined by KOZINSKI, Chief Judge, and BYBEE, Circuit Judge, concurring and dissenting:

I concur in parts I and II of the majority opinion's discussion. However, I respectfully dissent from part III of its discussion. The majority fails to recognize that there are three strikes against Dickens and he should be out of court. Strike one: Dickens is not eligible for the narrow exception to the exhaustion requirement that the Supreme Court recognized in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), because he raised his claim of ineffective assistance of counsel ("IAC") in state court and the claim was rejected on its merits. Strike two: Dickens's allegations that he suffers from organic brain damage and Fetal Alcohol Syndrome ("FAS") do not amount to a new claim and do not fundamentally alter the IAC claim that he advanced in state court and which the state court reasonably rejected. Strike three: were we to review the performance of sentencing counsel on its merits, we would have to conclude that counsel adequately presented mitigating evidence and that even if there were some failings, they were not prejudicial. We should affirm the district court's denial of Dickens's habeas petition.

I

The majority opinion fails to appreciate that the differences in procedural posture between this case and *Martinez* renders the *Martinez* exception inapplicable.

a. *The judicial proceedings in Martinez.*

While his direct appeal was still pending, Martinez began a state collateral proceeding. *Martinez*, 132 S. Ct. at 1314.

"Despite initiating this proceeding, [his appointed habeas] counsel made no claim trial counsel was ineffective and later filed a statement asserting she could find no colorable claims at all." *Id*. The state trial court gave Martinez notice that he could file a *pro se* petition in support of postconviction relief. *Id*. Martinez did not respond, and the state trial court "dismissed the action for postconviction relief, in effect affirming counsel's determination that Martinez had no meritorious claims." *Id*. The Arizona Court of Appeals affirmed Martinez's conviction, and the Arizona Supreme Court denied review. *Id.*

"About a year and a half later, Martinez, now represented by new counsel, filed a second notice of postconviction relief in the Arizona trial court." *Id*. The Supreme Court explained:

> Martinez claimed his trial counsel had been ineffective for failing to challenge the prosecution's evidence. He argued, for example, that his trial counsel should have objected to the expert testimony explaining the victim's recantations or should have called an expert witness in rebuttal. Martinez also faulted trial counsel for not pursuing an exculpatory explanation for the DNA on the nightgown. Martinez's petition was dismissed, in part in reliance on an Arizona Rule barring relief on a claim that could have been raised in a previous collateral proceeding. Martinez, the theory went, should have asserted the claims of ineffective assistance of trial counsel in his first notice for postconviction relief. The Arizona Court

of Appeals agreed. It denied Martinez relief
because he failed to raise his claims in the
first collateral proceeding. The Arizona
Supreme Court declined to review Martinez's
appeal.

132 S. Ct. at 1314 (citations omitted).

Martinez then filed a habeas petition in the District Court
for the District of Arizona. That court "denied the petition,
ruling that Arizona's preclusion rule was an adequate and
independent state-law ground to bar federal review." *Id*. at
1315. We affirmed, relying "on general statements in
*Coleman* that, absent a right to counsel in a collateral
proceeding, an attorney's errors in the proceeding do not
establish cause for a procedural default." *Id*. The Supreme
Court granted certiorari and issued its opinion in *Martinez*.

b. *The judicial proceedings in Dickens's case.*

The procedural posture for Dickens is different. On direct
appeal, the Arizona Supreme Court affirmed his conviction
and sentence. *State v. Dickens*, 926 P.2d 468 (Ariz. 1996).
In August 1999, Dickens filed an action for postconviction
relief ("PCR") in the state trial court. In October 2000, the
trial court issued a 33-page order denying relief. Most of the
order addressed the nine allegations of IAC by trial and
appellate counsel, which included a claim that Dickens "was
denied the effective assistance of counsel in the penalty
stage." Dickens presented a mitigation specialist who testified
that, in her opinion, defense counsel's preparation for the
mitigation and sentencing phase was inadequate and
unreliable. The trial court disagreed, writing:

The record reflects that defense counsel effectively elicited the testimony of mental health experts, family members and support witnesses who were well qualified and credible. Defense counsel presented numerous mitigating factors at the sentencing hearing. The performance of defense counsel is not to be judged by the outcome. Of course a person, exercising hindsight, can urge that more should have been done, however, under the circumstances at the time, defense counsel's assistance to Petitioner both in trial and during the penalty phase was professional, reasonable and effective. Most certainly, it did not fall to the level of ineffective assistance of counsel as set forth in *Strickland*. Further, Petitioner has failed to demonstrate that he was prejudiced by any performance of defense counsel.

Concluding on this claim, it is noted that it was the defendant/Petitioner's conduct, state of mind and participation in these crimes that led to the jury verdicts and the sentence imposed. It was not any inadequacy upon the part of either trial counsel or appellate counsel.

Dickens filed a petition for review with the Arizona Supreme Court, which the court summarily denied.

Dickens then filed a habeas petition in the District Court for Arizona. On July 14, 2008, the district court denied the petition in a 145-page decision. Among the claims the court

considered and denied was Dickens's claim of IAC by trial counsel (Claim 19). The district court carefully considered the performances of both trial counsel and PCR counsel and concluded that trial counsel's performance at sentencing was neither deficient nor prejudicial.

c. *Analysis*.

A comparison of the cases' procedural postures reveals why the *Martinez* exception is not available to Dickens. In *Martinez*, (1) Martinez's claim of trial counsel IAC was not raised in his first state PCR petition; (2) it was raised in a second state PCR petition which the state court held to be procedurally barred; and (3) the second state PCR petition presented evidence of IAC by trial counsel. In contrast: (a) Dickens's claim of trial counsel IAC was raised and denied on its merits by the state court in his first PCR petition; (b) Dickens never raised the claim of PCR counsel's alleged IAC in a state court; and (c) Dickens's assertion that trial counsel should have investigated whether he suffered from FAS and organic brain damage was raised for the first time in his federal habeas petition and has never been presented to a state court.

These differences disqualify Dickens from the *Martinez* exception on two grounds. First, unlike Martinez, whose trial counsel IAC claim was held to be procedurally defaulted by the state courts, Dickens did raise his claims of IAC by trial counsel in his first state PCR petition, and the claim was rejected on its merits. Second, unlike Martinez, Dickens has not sought to raise his "new" claim of trial counsel IAC in

any second or successive state PCR petition.[1]  Because
Dickens's claim was not deemed procedurally barred by the
Arizona state courts, he does not need, and cannot qualify for,
the *Martinez* exception to the general rule that on a habeas
petition a federal court will not consider an issue that was not
raised in state court.

The requirement that a state prisoner first raise his claims
in state court was emphasized by the Supreme Court in
*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).  The Court held
that "review under § 2254(d)(1) is limited to the record that
was before the state court that adjudicated the claim on the
merits," and stressed that this ruling was "compelled by the
broader context of the statute as a whole, which demonstrates
Congress' intent to channel prisoners' claims first to the state
courts."  131 S. Ct. at 1398–99 (internal quotation marks
omitted).  The Court specifically noted that "[i]t would be
contrary to that purpose to allow a petitioner to overcome an
adverse state-court decision with new evidence introduced in
a federal habeas court and reviewed by that court in the first
instance effectively *de novo*."  *Id*. at 1399.

The remand in *Martinez* did not violate the law or spirit
of *Pinholster* because Martinez had presented his claim of
trial counsel ineffectiveness to a state court in his second PCR
petition (that the state court had held was procedurally
defaulted).  *See Martinez*, 132 S. Ct. at 1314.  Moreover, his

---

[1] The majority asserts that "the first time [Martinez] argued ineffective
assistance of PCR counsel was in his federal habeas petition."  Maj. at 38
n.17.  However, at a minimum, the alleged IAC of PCR counsel was
implicit in Martinez's second state habeas petition.  Certainly the factual
basis for seeking an exception to the procedural bar was presented to the
state court.  *See Martinez*, 132 S. Ct. at 1314.

initial PCR counsel's ineffectiveness was apparent from the state court record, as she had filed a statement asserting that she could find no colorable claim to raise in the PCR petition that she had filed for Martinez. *Id*. Thus, when *Martinez* was remanded, the district court could determine on the record presented to the state courts whether Martinez's first PCR counsel had been ineffective, and whether his claim of trial IAC was substantial. *Id*. at 1321. In contrast, although Dickens raised his mental health as a mitigating factor, there is nothing in the state court record supporting Dickens's "new claims" of organic brain damage and FAS.

Thus, under *Pinholster*, the federal courts may not consider Dickens's unexhausted IAC claim.[2] This does not necessarily mean that Dickens is without a course of action. Dickens may still file a successive PCR petition in the state court alleging IAC by trial counsel and initial PCR counsel. If the state courts were to deny Dickens relief on the ground that the claim was procedurally defaulted, *then* he could file a federal habeas petition and argue for the application of the *Martinez* exception.[3] This process ensures that state courts

---

[2] To the extent that Dickens contends that his trial counsel IAC claim was exhausted (as he initially did), the district court had jurisdiction to consider it. However, the district court's careful consideration of the IAC claim persuasively shows that Dickens cannot prevail under the AEDPA standard. As set forth in section III, *infra*, I agree that Dickens has not shown that trial counsel's performance met either the performance or the prejudicial prong of the standard for IAC set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

[3] Of course, Dickens might be required to explain why he did not file his successive petition earlier. One response might be that until the Supreme Court decided *Martinez*, he was barred by *Coleman v. Thompson*, 501 U.S. 722 (1991), from obtaining relief based on PCR counsel's ineffectiveness.

get the first crack at new claims while preserving the defendant's ability to file a federal habeas petition if relief is denied.

This procedure was followed in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), in which the Supreme Court expanded *Martinez* to apply to states which permit defendants to raise IAC in direct appeals but prefer that they do so in PCR petitions. *Id.* at 1915. In *Trevino*, the federal habeas petition "claimed for the first time that Trevino had not received constitutionally effective counsel during the penalty phase of his trial." *Id.* The district court then "stayed proceedings to permit Trevino to raise this claim in state court." *Id*. at 1916. Trevino did so, but the Texas court concluded that because he "had not raised this claim during his initial postconviction proceedings, he had procedurally defaulted the claim." *Id*. Trevino returned to the federal court which denied relief leading ultimately to the Supreme Court's opinion. Thus, in both *Martinez* and *Trevino*, state courts determined, prior to the federal courts' rulings on the federal petitions, that the defendants' IAC claims were procedurally barred.

In contrast, the majority opinion, by allowing a state defendant to raise a "new" IAC claim for the first time in his federal petition, not only assumes that the state court would find the claim to be procedurally barred,[4] but also creates an

---

[4] The parties have informed us through letters submitted pursuant to Federal Rule of Appellate Procedure 28(j) that there are now decisions by superior courts in Arizona and by the Court of Appeals of Arizona, Division 2, holding that *Martinez* does not change Arizona law. While these may reflect Arizona law as it is, they are not binding on the Arizona Supreme Court and, of course, the state courts have not had an opportunity to fully consider the Supreme Court's recent opinion in *Trevino*. Furthermore, a review of the cases cited by the parties suggests that courts

incentive for the defendant not to raise an IAC claim in his state PCR petition if he thinks the federal courts will be more receptive to his claim. Why wouldn't a defendant hold back or forego developing one claim in his first postconviction petition in the hope that he may earn another round of postconviction proceedings by raising it for the first time in his federal habeas petition? The majority's approach encourages state defendants to concoct "new" IAC claims that are nothing more than fleshed-out versions of their old claims supplemented with "new" evidence. This cannot have been the Supreme Court's intention, nor is it an unintended but inherent consequence of the Supreme Court's opinions in *Martinez* and *Pinholster*. To the contrary, *Pinholster* requires that a defendant first raise his claim of trial counsel IAC in state court, and *Martinez* provides that when defendant does this, the state court's determination that the successive PCR petition is procedurally barred will not prevent federal court review when the failure to raise trial counsel IAC in the initial PCR petition was due to PCR counsel's IAC. Thus, *Martinez* is, and should be construed as, only "a narrow exception" to the preclusion rule.[5]  *See Martinez*, 132 S. Ct. at 1315.

---

may have determined that there was no merit to the particular petitioners' *Martinez* claims, rather than ruling that an otherwise meritorious claim of trial counsel IAC would not be considered. Of course, the Arizona courts may determine whether as a matter of state law they will modify their preclusion rule in light of *Martinez* and *Trevino*. However, we should not presume that they will forego considering an otherwise meritorious claim of trial counsel IAC that postconviction counsel failed to raise in favor of having the claim considered by a federal court in the first instance.

[5] I have no quarrel with the statement in the plurality opinion in *Detrich* that the *Martinez* exception *may* apply where PCR counsel raised some issues of trial counsel IAC, but not the new substantial claim of trial counsel IAC that he seeks to raise for the first time in his federal habeas petition. *See Detrich v. Ryan*, ___ F.3d ___, 2013 WL 4712729, *8–10

Dickens raised his claim of trial counsel IAC in state court and it was rejected on the merits. He does not qualify for the *Martinez* exception.

## II

Even if the *Martinez* exception were applicable to Dickens's case, I would affirm the district court's denial of the writ because the record shows that Dickens has not raised a new claim.

We all agree that Dickens did not present his allegations of organic brain damage and FAS to the state courts. The majority, however, then leaps to the conclusion that Dickens therefore has "defaulted on his IAC claim." This conclusion overlooks the facts that Dickens did raise claims of IAC at the sentencing stage based on his alleged mental health issues, and that the state court rejected those claims on the merits.

---

(9th Cir. 2013) (en banc). Here, as set forth *infra*, Dickens has not raised a new substantial claim of trial counsel IAC separate from the claims rejected on their merits by the state courts. However, where such an assertion is made, because there has been no state court determination that the new claim is procedurally barred, the district court should adhere to the procedure followed in *Trevino*, and stay proceedings to permit the petitioner to attempt to raise the new claim in state court. *See Trevino*, 133 S. Ct. at 1916.

In our case, Arizona has represented that it would be futile for Dickens to present his current IAC claim to the Arizona courts. Thus, Arizona may well have waived any argument that Dickens's current IAC claim is not procedurally barred. *See Trest v. Cain*, 522 U.S. 87, 89 (1997); *Lynce v. Mathis*, 519 U.S. 433, 436–37 n.4 (1997); *Gray v. Netherland*, 518 U.S. 152, 165–66 (1996). This possibility is not dispositive, however, because as explained in Sections II and III of this dissent, Dickens's claim is neither new nor meritorious.

Moreover, under our case law, Dickens's new allegations do not constitute a new claim. Thus, because Dickens's claim of trial counsel IAC was raised and rejected on the merits in his state PCR petition, the *Martinez* exception is not available to Dickens.

> In his PCR petition in the state superior court, Dickens alleged that he had received IAC at the sentencing stage. PCR counsel called as a witness a mitigation specialist who testified that defense counsel's preparation for the mitigation and sentencing phase was inadequate and unreliable. The district court in its decision noted that Dr. Roy, the clinical psychologist who assisted Dickens's counsel, testified that defense counsel gave him everything he needed to start an investigation and did not place any limits on his work. The district court further noted that trial counsel had been aware of the significance of the sentencing stage of trial, had secured the cooperation of Dickens and his family, had access to school and medical records, and had considered numerous possibilities of neurological impairment, but that trial counsel had concluded that "neurological testing did not establish an organic basis." The district court further rejected arguments that defense counsel's performance was below prevailing professional norms, noting that counsel had

properly informed Dr. Roy and reasonably relied on his advice.**[6]**

Dickens's present claim of trial counsel IAC simply adds additional factual allegations to his initial claim of trial counsel IAC. In state court, Dickens argued that counsel's preparation was inadequate. He continues to so argue, but now offers the additional allegation that, had counsel conducted an adequate investigation, he would have learned that Dickens suffered from organic brain damage and FAS.

But additional factual allegations do not state a new claim. In *Weaver*, we "acknowledge[d] that the precise factual predicate for Weaver's claim changed after the district court conducted its evidentiary hearing," but concluded that "new factual allegations do not render a claim unexhausted unless they 'fundamentally alter the legal claim already considered by the state courts.'" *Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999) (quoting *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994). Similarly, here, although "the precise factual predicate" of Dickens's IAC claim changed to specifically allege that he suffers from organic brain damage and FAS, his legal claim of IAC remains the same: counsel was ineffective because he failed to adequately

---

**[6]** The district court stated:

> Petitioner's complaint that counsel did not provide enough information or guidance to Dr. Roy is not supported by the record. It is evident that counsel, recognizing the significance of the penalty stage of trial, investigated Petitioner's background and presented the relevant information to Dr. Roy and offered it to the trial court in his sentencing memorandum and through expert and lay testimony.

investigate Dickens's mental health. There would be no end to litigation if every new allegation as to what counsel would have found had he properly investigated a defendant's background constituted a "new" claim.[7]

Moreover, the record shows that Dr. Roy did consider brain damage, and his report noted that Dickens's mother consumed wine at least three times per week while she was pregnant with Dickens. The record reflects that Dickens has not raised a new claim.

---

[7] This concern is illustrated by our recent decision in *Schad v. Ryan*, 732 F.3d 963 (9th Cir. 2013). There we rejected petitioner's contention that he was presenting a "new" issue of trial counsel IAC. We noted:

> Schad's principal contention is that the district court erred because he is presenting a different ineffective assistance claim than that presented in state court. He is now contending that the federal claim of counsel ineffectiveness with respect to the effect of childhood abuse is somehow distinct from the earlier claim of ineffectiveness in failing to investigate the childhood abuse itself. The two cannot be so easily separated, however, because the relevant mitigating factor in sentencing was always the effect of the childhood abuse on his adult mental state.

*Id*. at 966. Similarly, Dickens's "new" assertion is based on what he now contends trial counsel would have learned if he had adequately investigated his mental health, but Dickens's underlying claim, which was rejected by the state courts, was and is that trial counsel failed to adequately investigate his mental health.

Because Dickens has not raised a new claim, we must view his IAC claim through the AEDPA lens.[8]  This means that for relief on his federal habeas petition, Dickens must show that the state court's denial of claim of IAC was an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts.  28 U.S.C. § 2254(d); *see Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).  As further demonstrated in the following section, the state court's denial of Dickens's claim of trial counsel IAC is neither an unreasonable application of Federal law nor an unreasonable determination of the facts.

The majority, however, relies on two pre-AEDPA cases, *Aiken v. Spalding*, 841 F.2d 881 (9th Cir. 1988), and *Nevius v. Sumner*, 852 F.2d 463 (1988), to argue that Dickens has fundamentally altered his legal claim of IAC.  This argument is not persuasive.  In *Aiken*, the petitioner sought to present for the first time in his federal habeas petition "decibel-level" evidence to support his claim that he had requested counsel during his interrogation.  *Id*. at 883.  We held that this was the "very type of evidence which the state should consider in the

---

[8] Indeed, in his opening brief, filed before the Supreme Court's opinion in *Martinez*, Dickens argued that he:

> alleged that his trial counsel failed to conduct the necessary background mitigation investigation and therefore did not adequately prepare defense expert, Dr. Roy.  This was the same claim that he raised in his federal habeas proceedings with the exception of additional factual support for the claim – namely that Dickens suffers from FAS and organic brain damage.

In his brief, Dickens argues that because he exhausted his remedies in state court, "the district court was required to consider the additional facts in support of his claim."

first instance," and accordingly directed the district court to dismiss the habeas petition without prejudice for failure to exhaust state remedies. *Id*. at 883–84. Like the decibel-level evidence in *Aiken*, the evidence that Dickens suffers from organic brain damage and FAS is "the very type of evidence which the state should consider in the first instance.'" *Id*. at 883.

In *Nevius*, the defendant sought to challenge the prosecutor's seven peremptory challenges, excluding minorities from the jury. 852 F.2d at 466. At oral argument in the district court on his habeas petition, Nevius's counsel made serious allegations concerning alleged comments by the prosecutor to the defense counsel that were made after the trial. *Id*. at 469–70. We recognized that these representations, "if proven, might have presented in a different light the factual issues concerning the motivation of the prosecutor in exercising his peremptory challenges." *Id*. at 470. Nonetheless, we declined to consider the remarks, noting:

> The alleged remarks, however, are not part of any record in this case. They have not been presented to the state courts, either on appeal or during post-conviction proceedings. In habeas proceedings, the federal courts are not free to entertain new evidence that places the claim in a significantly different posture, when that evidence was never presented to the state courts.

*Id*. We concluded that "[if] there is evidence that should be presented to the state courts, then the attempt must first be made to present it there and to make a record. Only

thereafter, under the appropriate procedural strictures may the matter be addressed in federal court." *Id*. (footnote omitted).

The majority asserts that because we held in *Aiken* and *Nevius* that the new evidence should have been presented to the state courts, the new evidence must have stated a new or altered claim. But this is mixing apples and oranges. A state prisoner seeking federal habeas relief must present all new evidence to the state courts, regardless of whether the new evidence supports his existing claim, places the claim in a different light, or creates a new claim. *See Aiken*, 841 F.2d at 883. Whether or not Nevius's allegations created a new claim, he had to present the facts to the state courts. Similarly, even if Aiken's decibel-level evidence only improved "the evidentiary basis for Aiken's right-to-counsel and voluntariness arguments," *Aiken*, 841 F.2d at 883, and did not state a new claim or fundamentally alter the nature of his claims, the evidence had to be submitted to the state courts in the first instance. Thus, neither *Aiken* nor *Nevius* provides much guidance on what constitutes a "new" claim.[9] Instead, we should apply our more recent standard set forth in *Weaver*: "new factual allegations do not render a claim unexhausted unless they 'fundamentally alter the legal claim already considered by the state courts.'" 197 F.3d at 364 (quoting *Chacon*, 36 F.3d at 1468).

Furthermore, the majority seeks to use *Aiken* and *Nevius* for the exact opposite purpose for which they were decided. *Aiken* and *Nevius*, although pre-AEDPA cases, sought to

---

[9] In addition, we have questioned the continuing validity of cases such as *Aiken* and *Nevius* following the issuance of the Supreme Court's opinion in *Pinholster*. *See Stokley v. Ryan*, 659 F.3d 802, 808 (9th Cir. 2011).

reinforce the standard that newly discovered evidence had to be presented in the first instance in the state courts.[10] *Aiken*, 841 F.2d at 883. Here, the majority seeks to characterize Dickens's new allegations as fundamentally altering his previously exhausted IAC claim precisely to excuse his failure to present those allegations to the state courts and to allow him to present them *for the first time* in the federal district court.

This is contrary to the spirit of *Aiken* and *Nevius*, and most importantly, contrary to AEDPA. Title 28 U.S.C. § 2254(e)(2) limits when a federal court may hold an evidentiary hearing on a state prisoner's federal habeas petition.[11] The majority's holding circumvents AEDPA by

---

[10] In *Aiken*, we reiterated the Fifth Circuit's statement in *Dispensa v. Lynaugh*, 826 F.2d 375, 377 (5th Cir. 1987), that:

> [Where] a federal habeas petitioner presents newly discovered evidence or other evidence not before the state courts such as to place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it, the state courts must be given an opportunity to consider the evidence.

*Aiken*, 841 F.2d at 883 (alteration in original).

[11] 28 U.S.C. § 2254(e)(2) reads:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on--
>
> (i) a new rule of constitutional law, made retroactive to

providing a state prisoner an evidentiary hearing without inquiring into whether the new claim could or should have been previously raised. *See* § 2254(e)(2)(A)(ii). Instead, the prisoner need only convince a federal court that his claim of IAC on the part of his PCR counsel is new. He, apparently, is then entitled to an evidentiary hearing, at least to determine whether his PCR counsel was actually ineffective and whether his claim of trial counsel IAC is substantial. Majority at p. 33. This creates another unnecessary, expensive, and improper layer to federal court review of state sentences.

Although I agree with the majority that the "Arizona courts did not have a fair opportunity to evaluate Dickens's altered IAC claim," Majority at p. 32, it does not follow that Dickens's new allegations constitute a new claim subject to the application of the *Martinez* exception. Rather, because Dickens's new factual allegations do not fundamentally alter his legal claim of sentencing counsel IAC, which was rejected by the Arizona courts on its merits, federal court review is subject to and limited by AEDPA. In sum, Dickens has not raised a new legal claim.

---

cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

III

Finally, even if I thought that the *Martinez* exception applied to this case and that Dickens had raised a *new* claim, I would still affirm the district court's denial of the writ because the record compels a determination that Dickens cannot show "cause" and "prejudice" required for relief for IAC under *Strickland*, 466 U.S. at 687–96.

In *Martinez*, the Supreme Court held that a prisoner may establish default on an IAC claim "where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland*." 132 S. Ct. at 1318. In addition, the prisoner "must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.*

The record compels the conclusion that Dickens was not denied effective assistance of sentencing counsel in regard to his "new" claims of organic brain damage and FAS.[12] The

---

[12] Dickens argues that his PCR counsel were ineffective because they allegedly focused on claims of judicial bias instead of "investigating and presenting meritorious issues. Dickens complains that counsel "put on no lay or expert witness to show what evidence would have been presented had trial counsel properly investigated mitigation and adequately prepared Dr. Roy for sentencing." The district court disagreed with Dickens, noting that in the PCR proceeding, counsel argued that sentencing counsel "did not adequately prepare Dr. Roy or investigate Petitioner's background for mitigating information, particularly with respect to mental impairment." Although the record appears to support the district court's perspective, we need not evaluate the performance of PCR counsel when sentencing counsel's performance was adequate. *See Martinez*, 132 S. Ct. at 1318 ("[A] prisoner must also demonstrate that the underlying ineffective-

district court carefully reviewed the record of Dickens's sentencing and concluded that counsel was competent. I agree. Moreover, there is nothing in the record to suggest that sentencing counsel knew or should have known that Dickens possibly suffered from organic brain damage and FAS. Thus, even if Dickens's allegations are taken at face value, the record will not support a finding of "some merit" in his claims.

The district court's determinations are not binding but are illustrative. It noted:

> The [trial] court held a five-day sentencing hearing during which defense counsel called seven witnesses on Petitioner's behalf. After the hearing counsel submitted a 76-page sentencing memorandum. Counsel listed numerous nonstatutory mitigating circumstances, including Petitioner's diagnosis of borderline personality disorder with narcissistic features; a "troubled childhood" that featured "substantial sexual abuse and molestation, which gravely affected [his] development"; and his failure to receive necessary mental health treatment.

In order to counter the aggravating factors advanced by the State, trial counsel "emphasize[d] Petitioner's allegedly nonviolent nature and passive role in the murders." Counsel enlisted the assistance of Dr. Roy, a clinical psychologist who

---

assistance-of-trial-counsel claim is a substantial one."). If trial counsel's performance was adequate, the petitioner cannot have been prejudiced by PCR's counsel's alleged failure to challenge trial counsel's performance.

evaluated Dickens and prepared a 59-page report. Dr. Roy's report "contained 27 pages of background information, detailing Petitioner's childhood, education, medical and psychological history, employment background and legal history." Dr. Roy interviewed Dickens's parents and his mentor. Dr. Roy's report included information on Dickens's "reports of sexual abuse, head injuries, and the fact that Petitioner's mother drank alcohol while she was pregnant with Petitioner."

Dr. Roy's report recommended neurological examinations, including EEG and MRI exams. However, at an October 1993 hearing, counsel, after consulting with Dr. Roy, informed the court that in light of a CT scan, he no longer had reason to be concerned with Dickens's cerebral function.

Dr. Roy spent over 15 hours interviewing and testing Dickens. He then testified extensively at the sentencing hearing. The district court explained:

> [Dr. Roy] diagnosed Petitioner with major depression, severe; mixed personality, with borderline narcissistic features; and suspected mild traumatic brain injury. Dr. Roy described the antecedent of Petitioner's depression as his "near annihilation on a regular basis during his childhood." Dr. Roy testified that Petitioner was physically and sexually abused by his brother, abuse which was corroborated by Petitioner and his mother. This experience affected Petitioner's ego development and prevented normal psychosocial development. Petitioner's

"primary experience of the world was being victimized," and the resulting stress caused Petitioner to regress to a fixated state. Dr. Roy further testified that Petitioner was sexually abused by a "trusted family friend" at age six or seven; by "another adult in a position of authority," a teacher at age 12, 13, or 14; and by a law enforcement official. These experiences "impinge[d] his identity." However, according to Dr. Roy, despite these experiences Petitioner did not develop aggression. Rather, he dealt with his inner conflicts – "attempted to undo the trauma to him" – by helping youthful offenders. Unfortunately, Petitioner lacked "emotional ability" and experienced a "loss of ego boundary" which caused him to engage in sexual activities with underage males. Nonetheless, Dr. Roy determined that Petitioner did not meet the criteria for having violent propensities and his sexual activities with juveniles did not constitute violence. According to Dr. Roy, Petitioner was able to develop "observational capacity" and show empathy for children who had been abused. However, in attempting to "eliminate his conflicts" and "find appropriate discharge," Petitioner acted out his abuse, repeating the cycle and identifying with both victim and the aggressor. Dr. Roy testified that Petitioner's emotional age when having sex with juvenile males was 14–16.

Dr. Roy testified in support of various mitigating factors. He asserted that Dickens: (a) had the potential for rehabilitation; (b) possessed a "borderline character structure" but not an antisocial personality disorder; (c) had no history of violence; (d) was not a danger to others (except possibly teenage boys); (e) had close family ties; and (f) was considered "a valued and diligent employee and a high achiever." Dr. Roy "also testified that Petitioner's traumatic childhood was a mitigating circumstance, as was his failure to receive needed psychological care."

Dr. Roy noted that Dickens's slow processing time on some tests, history of head trauma, emotional confusion, concentration problems, and headaches raised the possibility that Dickens suffered from brain damage. Dr. Roy, however, noted "that a CT Scan and EEG were administered and the results were 'clear'" and that some of the tests he had administered "did not support a finding of organicity."[13] Nonetheless, Dr. Roy did not think Dickens was malingering. Moreover, Dr. Roy testified that Dickens had lacked the intent to kill the Bernsteins.[14]

Sentencing counsel also called Dickens's older brother who testified that Dickens was frequently beaten by his older brothers and was very remorseful for the victims of the

---

[13] The district court further determined that sentencing counsel "did not ignore or overlook evidence of possible brain damage," because although Dr. Roy noted that Dickens showed symptoms of neurological impairment, "neurological testing did not establish an organic basis."

[14] Dr. Roy also testified in detail about Amaral, who was Dickens's partner in crime and actually shot the victims. He thought that Amaral had a psychopathic personality and had controlled and manipulated Dickens.

shooting.  Counsel also called Michael O'Connor, a sheriff's sergeant from San Diego, who testified that when Dickens was referred to the Juvenile Intervention Diversion Program following a drug offense, he had worked well with the kids for five years.  In addition, counsel called a psychologist who had examined Amaral and Dickens's mother.  Counsel also called a family friend, who testified that Dickens "loved his mother, enjoyed helping out adults and was always busy with chores."

In support of its conclusion that "counsel's performance at sentencing was neither deficient nor prejudicial," the district court found that sentencing counsel had been aware of the significance of the sentencing stage of the trial.  The court found no factual basis for the allegation that counsel had failed to provide Dr. Roy with sufficient information or guidance.  It also found no basis for questioning counsel's decision to retain and rely on Dr. Roy, "an experienced clinical psychologist who had testified regarding mitigation on previous occasions."  The court observed that even if "Dr. Roy was not prepared to testify, or if his testimony was not persuasive, it was not the fault of defense counsel."

Having determined that sentencing counsel had performed adequately, the district court buttressed its denial of relief by also finding that Dickens could not meet the second prong of *Strickland* – that is, he could not show prejudice.  The district court's conclusion was based on the scope and depth of the mitigating case presented, as well as distinguishing trial counsel's performance from the performances addressed in

recent decisions of the Supreme Court.[15] The court determined that unlike the situations presented in those cases, Dickens's "claim of prejudice arising from counsel's investigation into mitigating circumstances and handling of Dr. Roy is not supported by the record." The district court opined: "[w]hether or not counsel should have provided Dr. Roy with additional information or direction, given the evidence that was presented in mitigation there was not a reasonable probability of a different sentence if counsel had taken a different approach to his mitigation case or more thoroughly prepared Dr. Roy as a witness." The court also commented that Dickens "failed to identify a significant disparity between the evidence that could have been presented at sentencing and the evidence that counsel did present."

Finally, the district court observed that Dickens was not prejudiced by counsel's performance at sentencing because "the same judge presided over both Petitioner's trial and

---

[15] The district court distinguished the cases of *Rompilla v. Beard*, 545 U.S. 374 (2005), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Williams v. Taylor*, 529 U.S. 362 (2000), based on the amount of mitigating evidence that counsel failed to present at sentencing. *See Rompilla*, 545 U.S. at 391–93 (counsel failed to present evidence of alcoholic and violent parents, extreme poverty, isolation, and reduced cognitive capabilities); *Wiggins*, 539 U.S. at 535 (counsel failed to present evidence of abusive alcoholic mother, physical and sexual abuse in foster care, and diminished mental capabilities); *Williams*, 529 U.S. at 395–96 (counsel failed to present evidence of parents' imprisonment for criminal neglect, abusive foster home, reduced mental capabilities, and commendations given to defendant for positive behavior). In all three cases, the Supreme Court held that if the jury had access to this information during the trial, there was a reasonable probability that a different sentence might have resulted. *See Rompilla*, 545 U.S. at 392; *Wiggins*, 539 U.S. at 536; *Williams*, 529 U.S. at 398.

sentencing and the litigation of his ineffective assistance claims during the PCR proceedings." The district court suggested that the standard should be whether there is a reasonable possibility that further mitigating evidence would have changed the trial judge's position.[16] The district court concluded the state trial judge "assessed Petitioner's ineffective assistance claim after presiding over trial and sentencing, applied *Strickland* to reject Petitioner's allegation of prejudice, and noted that imposition of the death sentence was not a close call."

As noted, the district court's conclusions are not binding on us, but its description of the sentencing hearing and defense counsel's efforts are accurate. Dickens's proffer of contrary evidence does not rise to the low threshold of "some merit." *Martinez*, 132 S. Ct. at 1318. Dickens asserts that his sentencing counsel had little experience with capital cases, did not conduct "assessment interviews" of family and friends to discover background information, and was not aware of mitigation specialists. Dickens objects that rather than conduct a complete mitigation investigation, sentencing counsel handed documents over to Dr. Roy "and left the entire presentation of the mitigation case in Dr. Roy's hands. Dickens further alleges that a box of general information was missing from the boxes of information given to Dr. Roy and that Dr. Roy had no experience presenting mitigating evidence in capital trials.

---

[16] The district court cited *Smith v. Stewart*, 140 F.3d 1263, 1270 (9th Cir. 1998) ("We are asked to imagine what the effect might have been upon a sentencing judge, who was following the law, especially one who had heard the testimony at trial. Mitigating evidence might well have one effect on the sentencing judge, without having the same effect on a different judicial officer.")

Addressing his claimed FAS and brain damage, Dickens now argues that even though Dr. Roy's report noted that Dickens's mother drank alcohol three times a week while she was pregnant with Dickens, counsel "failed to retain an expert to discuss the effects that alcohol had on his client *in utero*." He also argues that Dr. Roy's report indicated the possibility of organic brain damage that led to the further testing by a Dr. Weiss, but that Dr. Weiss was more concerned with a back injury Dickens sustained after the crime occurred, and his report failed to consider Dr. Roy's concern with limited brain functioning. Dickens claims that sentencing counsel "failed to equip Dr. Weiss with the tools necessary to properly make a determination regarding testing."

These observations do not provide a sound basis for an IAC claim. Dickens was tried and sentenced twenty years ago in 1993. Counsel's performance must be evaluated on the basis of the standard of representation as it then existed.[17]

---

[17] In *Strickland*, the Supreme Court stated:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

466 U.S. at 689.

*See Strickland*, 466 U.S. at 689. Moreover, as we recently reiterated in *Cox v. Ayers*, 613 F.3d 883 (9th Cir. 2010), "[t]he burden is on Petitioner to 'identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.'" *Id*. at 893 (quoting *Strickland*, 466 U.S. at 690). Here, taking Dickens's allegations at face value, his "new" claim of IAC lacks merit. He argues that counsel did not retain an expert to discuss the effects that alcohol had on his client *in utero*, but there is little to suggest that counsel should have been aware of this possibility. At most, it is possible that Dr. Roy might have been able to learn of this possibility, but there is nothing to suggest that he actually knew of the possibility or deliberately failed to inform counsel.[18] Similarly, counsel reasonably relied on his experts to assess the possibility of Dickens's brain damage. Again, it is possible, as Dickens now argues, that his experts failed to properly test and diagnose his brain

---

[18] In his 2002 declaration, Dr. Thomas Thompson, a psychologist retained by Dickens, alleges that "[a]lcohol exposure *in utero* is and was known to have a major teratogenic impact on the central nervous system (brain) of the developing fetus in 1992. He then lists a number of academic articles that discussed fetal alcohol syndrome that were available in 1992. However, when addressing the specifics of this case, Dr. Thompson writes:

> The amount of alcohol Joan Dickens consumed during her pregnancy with Greg constitutes an amount sufficient to produce Fetal Alcohol Syndrome as defined by the Institute of Medicine Report of 1996. *See Fetal Alcohol Syndrome: Diagnosis, Epidemology, Prevention, and Treatment* 74–79 (Kathleen Stratton, Cynthia Howe, and Frederick Battablia eds., Institute of Medicine, 1996).

This suggests that the test for FAS was not established or widely disseminated until 1996, three years after Dickens was sentenced.

damage, but sentencing counsel can hardly be faulted for not perceiving this.[19]

Furthermore, the alleged failure to detect two possible mental concerns must be considered in the context of all the psychological and mental mitigating factors that sentencing counsel and Dr. Roy did develop. As noted, Dr. Roy diagnosed Dickens "with major depression, severe; mixed personality, with borderline narcissistic features; and suspected mild traumatic brain injury." Dr. Roy testified to Dickens's beating by his brothers, his sexual abuse as a child, his history of head traumas, and even that his mother drank when she was pregnant with Dickens. Considering the totality of the evidence, the only reasonable conclusion is that sentencing counsel performed adequately, at least insofar as he failed to discover Dickens's alleged organic brain damage and FAS.

The totality of the evidence also compels the conclusion that even if sentencing counsel's performance somehow fell below the mark, Dickens was not prejudiced. In sentencing Dickens, the trial judge found at least two aggravating factors. The court found no statutory mitigating factors, and Dickens does not argue that his present claim of brain damage and FAS would constitute a statutory mitigating factor. The trial court noted that Dickens had urged a list of 31 non-statutory mitigating circumstances. It agreed with a number

---

[19] On appeal, Dickens has not offered any evidence that counters the district court's determination that he "failed to identify a significant disparity between the evidence that could have been presented at sentencing and the evidence that counsel did present." Whatever Dr. Roy's shortcomings in failing to diagnose Dickens with organic brain damage and FAS, there is nothing in the record to suggest that trial counsel knew or should have known of these alleged failings.

of these.  It found that Dickens "had a troubled childhood, that his family was somewhat dysfunctional, that he has always had a loving and caring mother and he now has a supportive family."  The court further found that Dickens exhibited "some sympathy or remorse," but that his "capacity to appreciate the wrongfulness of his conduct at the time of planning and execution of these offenses or to conform his conduct at that time to the requirements of law was not significantly impaired."  It is extremely unlikely that presenting further evidence concerning Dickens's brain damage or FAS would have resulted in a different sentence.[20]

In sum, in contrast to the factual records in cases where we have found IAC based on trial counsel's failure to adequately investigate or present a defendant's mental condition,[21] a review of Dickens's sentencing hearing (as well

---

[20] A report prepared by Dr. Thomas Thompson indicates that FAS may retard appropriate adult developmental maturity, result in poor judgment and decision making, and in Dickens "resulted in neuropsychological deficits that impaired his ability to overcome difficulties associated with a chaotic social-emotional learning environment present in the family home."  This is not an assertion that Dickens was not capable of appreciating the wrongfulness of his conduct.  Moreover, in the context of Dickens's involvement with Amaral and the murder, further medical explanations for Dickens's behavior were not likely to have changed the sentencing judge's mind.

[21] *See, e.g.*, *Silva v. Woodford*, 279 F.3d 825, 864 (9th Cir. 2002) (counsel's performance deficient where counsel "conducted no investigation whatsoever into Silva's past and also failed to even minimally assist in the preparation of possible mental defenses"); *Bean v. Calderon*, 163 F.3d 1073, 1078 (9th Cir. 1998) (counsel "engaged in no preparation" and "conducted no investigation of penalty-phase issues"); *Clabourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995) (counsel "did not call any witnesses, introduce any evidence of [defendant's] history of mental illness, or argue any mitigating circumstance besides [defendant's]

as his state postconviction proceedings) shows that trial counsel reasonably presented mitigating evidence concerning Dickens's mental condition.  Furthermore, it is unlikely that the state judge, who sentenced Dickens and presided over his postconviction proceeding, would have been swayed by the "new" evidence (developed well after his sentencing) that Dickens might have suffered from organic brain damage and FAS.  Accordingly, even if I could conclude that Dickens was procedurally eligible for the *Martinez* exception, and even if I could conclude that he is asserting a "new" claim that justifies him raising assertions for the first time in a federal habeas petition, I would still affirm the denial of Dickens's habeas petition because this record compels a determination that his sentencing counsel's performance was not inadequate.

For the reasons set forth in parts I and II of the majority opinion's discussion, Dickens's *Enmund/Tison* claim is properly rejected.  However, Dickens's request for relief pursuant to the Supreme Court's opinion in *Martinez* should also be rejected because he is not eligible for relief under *Martinez*, he has not proffered a "new" claim, and there is no merit to his proffered claim.  The district court's denial of his federal habeas petition should be affirmed. Accordingly, I respectfully dissent from majority's remand of this case to the district court.

---

mental condition at the time of the offense"); *Wallace v. Stewart*, 184 F.3d 1112, 1114 (9th Cir. 1999) (counsel failed to discover and provide to their mental health experts various test results and information about defendant's incredibly dysfunctional family background).

CHRISTEN, Circuit Judge, with whom Judges PREGERSON, WARDLAW, BERZON, and MURGUIA join, dissenting in Parts I and II, concurring in Part III:

The majority makes a persuasive case in support of an uncontested issue: that the record supported the jury's decision to convict Gregory Dickens of robbery, conspiracy to commit robbery, and felony murder. But the question we must decide is whether the record and the law justify the Arizona Supreme Court's decision to affirm the imposition of the death penalty. Because imposing the death penalty in this case is an unreasonable application of clearly established law as articulated by the United States Supreme Court in *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), and because at least two unreasonable findings of fact were critical to the Arizona court's decision, I respectfully dissent from the majority's opinion.

Imposing the death penalty on Gregory Dickens, the getaway driver in an armed robbery "who neither took life, attempted to take life, nor intended to take life," violates the Eighth and Fourteenth Amendments and is an unreasonable application of clearly established federal law. *See Enmund*, 458 U.S. at 787, 801. Dickens's participation in his crime so closely resembles the actions of Earl Enmund in *Enmund v. Florida*, where the Supreme Court held that the death penalty could not be constitutionally imposed, that it cannot be meaningfully distinguished. Dickens's culpability falls far short of the narrow exception to *Enmund*, created by *Tison v. Arizona*, for individuals whose conduct constitutes "major participation" in the felony offense and reckless indifference to human life. 481 U.S. at 158. The petition should be granted.

## I.  Unreasonable Application of *Enmund/Tison*

### A.  Major Participation

In *Enmund v. Florida*, the Supreme Court held that the death penalty was unconstitutional as applied to a petitioner convicted of felony murder under facts strikingly similar to Dickens's case.  458 U.S. at 788–801.  Earl Enmund was a getaway driver in an armed robbery.  *Id.* at 788.  While he was waiting in a car nearby, his accomplices killed two robbery victims at the back door of their home.  *Id*. at 784, 788.

In its review of the Florida court's death eligibility determination, the Court made clear that it had "no doubt that robbery is a serious crime deserving serious punishment," but it observed that robbery "is not, however, a crime 'so grievous an affront to humanity that the only adequate response may be the penalty of death.'"  *Id*. at 797 (citing *Gregg v. Georgia*, 428 U.S. 153, 184 (1976)).  The Court further prefaced its opinion with the observation that the question before it was not whether the death penalty is a disproportionate punishment for murder generally, "but rather the validity of capital punishment for Enmund's own conduct."  *Id.* at 798.  The Court stressed that the focus of inquiry must be on Enmund's culpability rather than the culpability of the accomplices who committed the actual murder, "for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence.'"  *Id.* (quoting *Lockett v. Ohio*, 438 U.S. 586, 605 (1978)).  The Supreme Court has been consistent in instructing that death sentences for accomplices who do not kill or intend that a killing take place are reserved for offenders who manifest the highest levels of culpability.  *See, e.g.*, *Tison*, 481 U.S. at 157

(identifying offenders who rank among "the most culpable and dangerous of murderers"); *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (stating that capital punishment must be limited to offenders with "extreme culpability" (internal quotation omitted)).

Enmund was by no means an innocent bystander; his involvement was that of an accomplice to a planned, armed robbery. *Enmund*, 458 U.S. at 797. The Supreme Court cabined its opinion to an evaluation of the appropriateness of the death penalty in a situation where a defendant was not one of the triggermen, but was a constructive aider and abettor waiting to help his robber accomplices escape. *Id.* at 786 n.2, 788. Apart from his status as a getaway driver, the Court did not need to reach many of the facts in *Enmund* because the Florida Supreme Court did not rely on them. But it is clear that Enmund was a part of the planned criminal enterprise — he was, after all, the getaway driver waiting to help his accomplices escape at the time the murders took place. Indeed, in order to be convicted of aiding and abetting under Florida law at the time, Enmund had to be found to be constructively present, "pursuant to a previous understanding," and situated so as to abet or encourage the actual perpetrator in committing the felony or in escaping after its commission. *Enmund v. State*, 399 So.2d 1362, 1370 (Fla. 1981), *rev'd*, 458 U.S. 782 (1982).

Ultimately, the Court reasoned that because Enmund "did not kill or intend to kill," the imposition of the death penalty was impermissible. 458 U.S. at 798, 801. In reaching this decision, the Court observed that at the time of its opinion it was "not aware of a single person convicted of felony murder over the past quarter century who did not kill or attempt to

kill, and did not intend the death of the victim, who has been executed." *Id.* at 796.

Dickens's participation in the robbery that resulted in the murders of Laura and Bryan Bernstein is strikingly similar. If there is such a thing as a generic description for a getaway driver, Dickens's involvement fits the bill: he helped plan the robberies in advance, he either "furnished Amaral with the weapon used in the murders or knew Amaral had the weapon with him for the robberies; [he] drove Amaral to the scene, waited while Amaral committed the robberies, picked up Amaral after the crime, witnessed the destruction of evidence, and failed to report the crimes." *State v. Dickens*, 926 P.2d 468, 490 (Ariz. 1996). The death penalty cannot be constitutionally applied in Dickens's case because, as in *Enmund*, Dickens was a getaway driver for a planned robbery, he "did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder." *Enmund*, 458 U.S. at 795. Dickens was removed from the immediate scene of the murder, just as Enmund was. *See id.* at 786.

A writ of habeas corpus is appropriate if the adjudication of a claim "resulted in a decision that . . . involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[A] state-court decision . . . involves an unreasonable application of [Supreme Court] precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or *unreasonably refuses to extend that principle to a new context where it should apply*." *Williams v. Taylor*, 529 U.S. 362, 407 (2000) (emphasis added). The Arizona Supreme Court's decision to affirm the death penalty

in Dickens's case contravenes clearly established law set out
in *Enmund.*

The imposition of the death penalty in this case cannot be
justified under the narrow exception to the *Enmund* rule
established in *Tison v. Arizona*. 481 U.S. at 158. On the
contrary, *Tison*'s sharply contrasting facts only underscore
that the death penalty should not be imposed here. The
exception established in *Tison* permits the imposition of the
death penalty for petitioners who neither intended to kill their
victims nor inflicted the fatal wounds, but it is only available
where there has been a finding that a petitioner's "degree of
participation in the crimes was major rather than minor, and
the record would support a finding of the culpable mental
state of reckless indifference to human life." *Id.* at 151.

It cannot be credibly argued that Dickens's culpability
approaches that of the Tison brothers, who helped their father
— a convicted murderer —  and their father's cellmate —
another convicted murderer — escape from prison. Murder
was not just a hypothetical result of the Tison brothers' plan;
they knew their father had murdered a prison guard during a
previous prison escape. *Id*. Armed with an ice chest full of
guns, the Tison brothers were major participants in a crime
spree that progressed from a jailbreak to robbery, kidnaping,
and the murder of four members of an innocent family. *Id.* at
139–42. The Supreme Court concluded that the Tison
brothers' participation would "clearly support a finding that
they both subjectively appreciated that their acts were *likely*
to result in the taking of innocent life." *Id*. at 152 (emphasis
added).

The Tison brothers' active participation continued after
they helped the two murderers escape from prison. When the

getaway car they were using had a flat tire and they needed a different vehicle, *id.* at 140, 152, one of the Tison brothers "performed the crucial role of flagging down a passing car occupied by an innocent family whose fate was then entrusted to the known killers he had previously armed." *Id.* at 151. The brothers robbed the family, participated in driving the family into the desert, and guarded the victims at gunpoint. *Id*. at 140, 151. They knew that their father was "thinking about" killing the family, but there is no hint that the brothers made any attempt to intervene. *See id*. Instead, the record showed that the brothers were standing close by when they "saw [their father's cell mate] and their father brutally murder their four captives with repeated blasts from their shotguns." *Id.* at 140–41. One brother "later said that during the escape he would have been willing personally to kill in a 'very close life or death situation' and that he recognized that after the escape there was a possibility of killings." *Id.* at 144.

Regarding the Tison brothers' degree of participation, the Court wrote: "Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight." *Id.* at 158.

Dickens, by contrast, *was* "sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery." *Id*. The robbery took place at night, in a rest area on the opposite side of a divided highway from where Dickens waited in a getaway car. *Dickens*, 926 P.2d at 474–75. Though the majority paints a picture in which Dickens watched "each part" of the murders, the record only

shows that, from where he waited on the far side of the highway, Dickens could see a flicker of light as Amaral and the victims passed in front of the headlights on the Bernsteins' car.

## B. Reckless Indifference

Under the exception articulated in *Tison*, even major participation in a felony offense is insufficient unless it is combined with a finding of "reckless indifference to human life."[1]   481 U.S. at 158.   This requirement presents an independent constitutional barrier to imposing the death penalty in Dickens's case because support for the Arizona court's finding of reckless indifference to human life is considerably weaker here than it was in *Tison*.

*Tison* recognized that the common law and modern criminal codes classify behavior that constitutes "reckless indifference to human life" with intentional murder.  *Id.* at 157.  Today, the Model Penal Code continues to observe this important classification.  MODEL PENAL CODE § 210.2(1). *Tison* does nothing to undermine the long-standing reservation of the death penalty for only the most serious offenders.  Under *Tison*, it is the reckless disregard for human life implicit in "*knowingly engaging in criminal activities known to carry a grave risk of death*" that represents the highly culpable mental state that may be considered in death

---

[1] Notably, though the Tison brothers provided an "arsenal of lethal weapons" to two convicted murders, were "prepared to kill in furtherance of the prison break," and had heard their father say he was "thinking about" killing an innocent family they had helped rob and kidnap, the United States Supreme Court did not make a finding of reckless indifference to human life.  *Tison*, 481 U.S. at 151.  Instead, the Court remanded the question to the Arizona court to make that determination.

eligibility determinations.  481 U.S. at 157–58 (emphasis added).

In its analysis of the reckless indifference part of the *Tison* exception, the Arizona Supreme Court adopted the trial court's findings regarding Dickens's major participation, discussed above.[2]  *Dickens*, 926 P.2d at 490.  The Arizona court also considered three other factors: "that Defendant [1] had considerable experience with the justice system through his other felony convictions, [2] was aware that Amaral had a violent and explosive temper, and [3] failed to render aid knowing that one victim might not be dead."  *Id.*  None of these factors warrants the imposition of the death penalty in this case.

First, the Arizona court referred to Dickens's "considerable experience with the justice system through his other felony convictions" when it decided that Dickens acted with reckless indifference to human life.  *Id.*  But Dickens's prior convictions were for forgery and lewd and lascivious acts with a minor; deplorable crimes, but not crimes that demonstrate a reckless indifference to human life.

The Arizona Supreme Court also considered that Dickens knew Amaral had a violent and explosive temper.  The majority also cites this factor, arguing that Dickens "could have foreseen that lethal force might be used," and suggesting that this is a marked difference between Dickens's case and *Enmund*.  Maj. Op. at 22, 25.  But by relying on the foreseeability of this robbery going awry, the Arizona court

---

[2] The *Tison* court noted that a finding of reckless indifference might be supported by the same facts that support a finding of major participation. 481 U.S. at 158 n.12.

and the majority stray from the boundaries imposed by the Supreme Court. If the "reckless indifference" part of the *Tison* test could be satisfied merely by showing that it was foreseeable an armed robbery could turn deadly, the *Tison* exception would swallow the *Enmund* rule. As the Supreme Court expressly acknowledged in *Tison*:

> [p]articipants in violent felonies like armed robberies can frequently 'anticipat[e] that lethal force . . . might be used . . . in accomplishing the underlying felony.' Enmund himself may well have so anticipated. Indeed, the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen . . . ." 481 U.S. at 151 (internal citation omitted).

In *Tison*, the Supreme Court rejected Arizona's less rigorous standard that permitted application of the death penalty for murder accomplices who could "anticipate[] that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony." *Id.* at 150–51. Because virtually *any* armed robbery carries the risk that lethal consequences could result, the majority errs by treating forseeability as a proxy for the more demanding "reckless indifference" standard required by the Court. *Id.*

Finally, the Arizona court concluded that the reckless indifference part of the *Tison* exception was satisfied because Dickens "failed to render aid knowing that one victim might not be dead." 926 P.2d at 490. The record simply does not support this finding of fact. At best, Amaral initially gave equivocal testimony at trial regarding whether Dickens drove

through the rest area after Amaral committed the murders, but he corrected his own testimony and clarified that he could not recall whether this occurred.[3] Even after prompting, Amaral testified, "I still don't remember him coming in as I'm going out. There was not enough time span where he left the other side to get across when I was running." Transcript of Record at 199, State v. Dickens, (Ariz. Super. Ct. 1993) (No. 18454). The only other witness, Dickens himself, flatly denied that he drove into the rest area. *Id*. at 162. Because the Arizona Supreme Court, and the majority, place significant emphasis on speculation that Dickens knew one of the victims might have survived, it is important to recognize that the jury did not hear conflicting testimony on this point. The finding that Dickens failed to render aid to a surviving victim was not the result of the jury hearing two versions of events and simply choosing to believe one witness instead of the other. To be sure, Amaral was a shockingly inconsistent witness — even debuting an entirely new account of the events for the first time at trial that involved Dickens actually giving him directions via never-previously-mentioned walkie-talkies.[4] But there is no support for the Arizona court's unreasonable

---

[3] During trial Amaral testified: "I do believe from a conversation we had later on, he did say he was going through the rest stop to make sure nobody was moving or everything was taken care of." Transcript of Record at 16, State v. Dickens, (Ariz. Super. Ct. 1993) (No. 18454). But on cross examination Amaral clarified that he could not remember whether Dickens drove through the rest stop: "The only thing I can remember is he came and picked me up, I don't know if he was leaving the interstate as far as leaving the rest stop or coming into the lane going out of the rest stop." *Id*. at 88.

[4] Amaral agreed to testify against Dickens to avoid receiving the death penalty himself, and he gave several pre-trial statements. *Dickens*, 926 P.2d at 478.

finding that Dickens drove through the rest area and failed to render aid to a surviving victim.

The majority recognizes, as it must, that Amaral's "walkie-talkie scenario" cannot reasonably be relied upon. Maj. Op. at 8 n.4. Amaral had made no mention of the "walkie-talkie scenario" in any of his pre-trial statements and no physical evidence supported this theory. Conveniently, Amaral's new version of the robbery involved the claim that Dickens and Amaral were using walkie-talkies and that Dickens directed Amaral to leave "no witnesses." But in his argument before the Arizona Supreme Court, even the Arizona Assistant Attorney General conceded that neither the jury nor the trial court believed Amaral's walkie-talkie story.[5] He argued that the Arizona Supreme Court "shouldn't believe[] the walkie-talkie testimony" either. The Assistant Attorney General surmised, "maybe [Amaral] decide[d] to add a little something extra to his testimony to try and make it more damning to [Dickens]." Transcript of Oral Argument, State v. Dickens, 926 P.2d 468 (Ariz. Jan. 18, 1996) (No. 93-0543). The Assistant Attorney General added, "there is no question here, the plan was to rob. The plan was not to kill." *Id*.

Disregarding the evidence in the record and the position of the Arizona Assistant Attorney General, the "Facts and Procedural History" section of the Arizona court's opinion

---

[5] There can be little doubt the jury did not buy the last minute flourish Amaral added to his testimony; they acquitted Dickens of premeditated murder and conspiracy to commit murder. The majority acknowledges as much: "[T]he jury did not convict Dickens of premeditated murder or conspiracy to commit murder, indicating it likely did not believe Amaral's testimony that Dickens ordered him to kill the Bernsteins over a two-way radio." Maj. Op. at 24 n.13.

includes that court's independent factual finding that "speaking through the walkie-talkie, Defendant then told Amaral, 'No witnesses.'" *Dickens*, 926 P.2d at 474. And the section of the Arizona court's opinion that specifically considered the imposition of the death penalty builds on this mistake, citing Dickens's "fail[ure] to render aid knowing that one victim might not be dead." *Id.* at 490. The only way Dickens would have known that Bryan Bernstein had survived is if he had driven through the rest area, and there is no competent evidence that this occurred.

A petition for writ of habeas corpus may be granted where it is shown that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2). Here, evidence from the trial court proceedings does not support the Arizona Supreme Court's independent finding that Dickens gave directions to Amaral over a walkie-talkie, or its finding that Dickens failed to render aid.

In light of the evidence presented in the state court proceeding, how is it that the majority reaches the conclusion that Dickens, a getaway driver, fits into the narrow exception carved out by *Tison*? What facts permit Dickens's actions to be deemed comparable to the extraordinarily more culpable criminal conduct of the Tison brothers? The majority answers these questions by relying on at least two critical, unsupported, and unreasonable findings of fact. In other words, the majority makes the same mistakes made by the Arizona court.

First, the majority states: "Dickens drove through the rest stop to, *in his words*, verify that 'everything was taken care of' and pick up Amaral." Maj. Op. at 19 (emphasis added).

But these were *not* Dickens's words; they were Amaral's words, and, as already explained, Amaral corrected his own testimony on cross examination by clarifying that, "The only thing I can remember is he came and picked me up, I don't know if he was leaving the interstate as far as leaving the rest stop or coming into the lane going out of the rest stop." Transcript of Record at 88, State v. Dickens, (Ariz. Super. Ct. 1993) (No. 18454). Without evidence that Dickens drove through the rest area, the only hint of support for the finding that Dickens "failed to render aid knowing that one of the victims might not be dead" is the thoroughly discredited walkie-talkie testimony that neither the trial court nor the jury believed.

Second, likely because the *Tison* court considered the Tison brothers' proximity to the murders in that case, the majority attempts to place Dickens in close proximity to the murders. The majority asserts that Dickens "watched from his truck" and could see "each part of the Bernsteins' murders as they unfolded." Maj. Op. at 7, 19. But the record contradicts the notion that Dickens could see the murders. The Arizona Supreme Court's opinion certainly does not support the majority's assertion; it only notes that it was 9:17 p.m., that Dickens was waiting in the eastbound rest area, that he saw the Bernsteins' car drive into the westbound rest area across the highway, and that Dickens later "saw a muzzle flash and heard two shots." 926 P.2d at 474–75. The trial court record actually refutes the majority's finding. Officer Johnson (the first officer on the scene), speaking from his previous experience being at the subject rest areas at night, testified that the rest areas have no lighting, and that, looking from one rest area to the other, at best only silhouettes can be seen. Dickens testified consistently. He said he watched Amaral "disappear[] out of my sight just

about the side of the freeway" and that he could only see "shadows" or "flashes of light as if someone passed in front of the headlights." The evidence does not support the majority's statement that Dickens watched "each part of the Bernsteins' murders as they unfolded." Maj. Op. at 19.

What the record does support is that Dickens did what getaway drivers do. Like Enmund, he planned or acquiesced in plans to commit an armed robbery, drove a dangerous accomplice to the crime scene, waited for the robbery to occur, drove his accomplice away from the crime scene, witnessed or directed the destruction of evidence, and failed to report the crimes.[6]

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to this case and the majority correctly notes that the threshold to obtain relief is heightened due to its application. But in my view relief should be granted in this case because the Arizona Supreme Court's decision involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, and because it was based on an unreasonable determination of the facts in light of the record before the state court. *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 785 (2011) (quoting 28 U.S.C. § 2254). The majority

---

[6] In a further attempt to distinguish Dickens's case from *Enmund*, the majority argues that Dickens participated in the destruction of evidence and either provided a weapon to Amaral, or knew that Amaral had one. Maj. Op. at 16. The Supreme Court did not reach these facts, but the record does show that Enmund and Dickens have these actions in common. There was testimony in Enmund's case that he directed his common-law wife to get rid of the guns used in the murders, *see* 399 So. 2d at 1366, and Enmund likely supplied at least one of the weapons used in the crime. *Id.*

argues that relief cannot be granted because the facts of Dickens's case fall somewhere between the facts in *Edmund* and the facts in *Tison*. That will always be true when a decision runs afoul of the rule that a state court unreasonably applies clearly established federal law when it fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 407. Read together, *Enmund* and *Tison* reaffirm that the death penalty is to be reserved for the very most culpable offenders. Where the facts do not show that a defendant killed, attempted to kill, or intended to kill, the Constitution requires a showing of major participation in criminal activities known to carry a grave risk of death and reckless disregard for human life. Allowing the death penalty to be imposed on a getaway driver in a planned armed robbery — even a getaway driver who later witnessed the destruction of evidence — is an unreasonable application of clearly established federal law.

The Arizona Supreme Court's decision also rests upon objectively unreasonable findings of fact. The trial court's special verdict makes no mention of walkie-talkies or the "no witnesses" comment. The finding in the Arizona Supreme Court's death eligibility determination — that Dickens "failed to render aid knowing that one victim might not be dead" — was made by the Arizona trial court, but it was utterly unsupported. As explained, there was no competent evidence that Dickens drove through the rest area, and, therefore, no basis for the court's speculation that Dickens knew Bryan Bernstein may have survived the shooting.

The Supreme Court has observed that, "[w]hen the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." *Kennedy*, 554 U.S. at 420. The

majority's read of *Enmund* is so narrow that it would likely forbid habeas relief to Earl Enmund himself. The majority finds Dickens's actions comparable to those of the Tison brothers, yet the Tison brothers' active participation in murder and reckless indifference to human life made them the epitomes of the exception to the rule that those who do not murder, attempt to murder, or intend that a murder occur, should be spared the death penalty.

A getaway driver in an armed robbery, Dickens is entitled to habeas relief because the Arizona Supreme Court's adjudication of the death penalty claim was an unreasonable application of clearly established law as articulated by the United States Supreme Court, 28 U.S.C. § 2254(d)(1), and because it rested on at least two unreasonable determinations of fact in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(2).

## II.  The *Martinez* Issue

Petitioner argues that post-conviction counsel was ineffective for failing to argue the ineffectiveness of his sentencing counsel. Before *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309 (2012), that claim was barred. After conducting a lengthy, pre-*Martinez* evidentiary hearing, the district court found that the additional factual allegations contained in the four volumes of exhibits filed with Dickens's federal habeas petition:

> "materially strengthen the claim presented to the state courts" and "present[] this claim in a significantly different and stronger posture than it had in state court and fundamentally

> alters the claim considered by the state courts."

The district court used unequivocal language: footnote 9 of its December 2004 ruling states that the court "summarily rejects Petitioner's argument that the additional factual allegations in support of habeas Claim 19 were fairly presented and exhausted in the state court and rejects that the Arizona Supreme Court's independent review exhausted these allegations."

Because *Martinez* permits petitioners to argue the ineffectiveness of post-conviction counsel, and because the district court found that the previously unconsidered evidence fundamentally alters the ineffective assistance of counsel claim in this case, I agree with the majority that this case must be remanded to the district court for initial consideration of the claim that counsel provided ineffective assistance.

## III.    Conclusion

I respectfully dissent from the majority's analysis of *Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987). For the reasons explained, I would grant relief and decline to reach petitioner's argument under *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309 (2012). Nevertheless, because the majority does reach the *Martinez* issue, I join in its judgment to vacate the district court's ruling regarding whether cause existed to overcome the procedural default of Dickens's claim of ineffective assistance of sentencing counsel, and to remand to the district court to consider the issue in light of *Martinez*.